[S. F. No. 13354. In Bank.—November 1, 1930.]

JOHN W. PRESTON et al., Respondents, v. AMELIA HERMINGHAUS et al., Appellants.

Everts, Ewing, Wild & Everts, C. M. Ozias, ·Cushing & Cushing and William H. Gorrill for Appellants.

Theodore M. Stuart, James F. Peck and Robert E. Hatch for Respondents.

THE COURT.—This action was brought for the purpose of collecting attorneys' fees alleged to be due plaintiffs from the defendants for legal services rendered by plaintiffs as attorneys at law in protecting defendants' water rights. It appears that defendants, in the year 1924, were the owners of a tract of land containing about 18,000 acres in Fresno and Madera Counties and adjacent to the San Joaquin River, all but 1,000 acres being riparian thereto. These valuable water rights were in danger by reason of threatened and actual diversions and appropriations by the Southern California Edison Company, the San Joaquin Water Storage District, the Madera Irrigation District, the San Joaquin Light and Power Corporation, Miller & Lux, Inc., and by other corporations and individuals. The defendants found it advisable to retain attorneys in order to properly protect themselves against these threatened and actual invasions of their rights, and in 1924 they retained plaintiffs for that purpose and for the purpose of recovering damages for any unlawful interference with their interests. The terms of this original contract of employment are not important on this appeal, for reasons that will presently appear. The plaintiffs, as attorneys for the defendants, started proceedings against the chief diverter and appropriator, the Southern California Edison Company, to enjoin that company from diverting and appropriating any water to the injury of defendants' riparian rights. This action will hereafter be referred to as the injunction suit. After a long and arduous trial the plaintiffs secured an injunction in defendants' favor. From this judgment the Southern California Edison Company appealed to this court. While the appeal was pending, the plaintiffs and

defendants herein entered into a written contract on October 8, 1925, purporting to fix the fee of plaintiffs for the legal services rendered and to be rendered in protecting defendants' riparian rights. It is the interpretation of this contract that is involved in this action.

Under the terms of this contract the plaintiffs defended the judgment on appeal in the injunction suit and secured in this court an affirmance of the judgment of the trial court. (*Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 Pac. 607].) The Edison Company then appealed to the United States Supreme Court, but the plaintiffs succeeded in securing a dismissal of the appeal on the ground of lack of jurisdiction.

Immediately after the affirmance by this court of the judgment in the injunction suit on December 24, 1926, the Southern California Edison Company filed two actions, one in Madera County and one in Fresno County, for the purpose of condemning a portion of defendants' water rights. These actions will hereafter be referred to as the condemnation suits. The first of these actions was set for trial in October, 1927. Under the terms of their contract of employment, plaintiffs took the necessary steps for the proper defense of these actions, and handled all matters incident thereto until the same were dismissed under circumstances to be discussed later. In the meantime, and during and after the pendency of the appeal in the injunction suit, the Southern California Edison Company, by an arrangement with the defendants consummated by plaintiffs as attorneys, made payments to the defendants herein of sums of money totaling $260,000, the consideration for which was the temporary waiver by defendants of their right to complain of the use of the water by the Southern California Edison Company, contrary to the provisions of the injunction. From this $260,000 defendants paid plaintiffs the sum of $35,000 on account of attorneys' fees, upon which point there is no dispute on this appeal.

As previously stated, the first of the condemnation suits was set for trial in October, 1927. On or about October 17th, P. H. Bottoms, the official representative and agent of the Herminghaus people, without the attendance of any of their counsel, and without consulting said counsel as to his purpose, sold to the Southern California Edison Company the

entire holdings of the Herminghaus people on the San Joaquin River. During the conference with the representatives of the Edison Company, Bottoms made no attempt to consult with plaintiffs, and in no way informed them of the proposed sale until after it was consummated. By the terms of this sale defendants received the sum of $873,200 in cash for the property on the basis of $50 an acre for the acreage involved. If this sum be added to the sum already received, the total is $1,133,200. As a part of this deal the defendants gave a full release to the Southern California Edison Company, and conveyed the property to its subsidiary, the Edison Securities Company, and then instructed plaintiffs to participate in the dismissal of the condemnation suits. It should here be noted that it is agreed between the parties to this appeal that, in consummating the above deal with the Southern California Edison Company, neither the defendants nor the Edison people made any attempt to allocate any part of the purchase price to water or water rights alone, the entire sum having been paid for the land and water rights together, or, more correctly, for the riparian land. The sale of the entire property, of course, terminated plaintiffs' employment, there no longer being any water rights of the defendants to protect. Furthermore, it is conceded by defendants that this termination of the contract of employment amounted to complete performance on the part of plaintiffs.

The contract of employment herein involved was, as before stated, entered into on October 8, 1925, after the employment of plaintiffs had begun and while the relationship of attorney and client existed. The final draft of the contract was prepared by plaintiffs, and there can be but little doubt that both parties thereto were attempting to provide, and intended to provide, for all contingencies that might thereafter arise. The contract first provides that the water rights of the defendants are in danger by diversions and appropriations, both threatened and actual, by certain enumerated corporations and individuals, and that it has therefore become necessary for defendants to employ attorneys to represent them in protecting and preserving their water rights; that the plaintiffs have already instituted and successfully prosecuted the injunction suit in the trial court, which case is now on appeal, and then continues as follows:

"Now, therefore, it is agreed as follows:

"(1) That the parties of the first part [defendants herein] do hereby retain and employ the parties of the second part [plaintiffs herein] as their attorneys in the matter aforesaid for the period of five years from the date hereof unless said matters are sooner accomplished or otherwise terminated by mutual consent and also so long after said date as may be necessary to complete any unfinished litigation which is in good faith being prosecuted at said expiration date, whether for parties of the first part as plaintiffs or defendants.

"(2) Parties of the second part agree to commence and prosecute any further action or actions that may be necessary or advisable to fully protect the interests of said first parties and, if so advised, will at the request of said first parties appear in and prosecute a suit now pending in the Superior Court of the State of California in and for the county of Fresno wherein parties of the first part are plaintiffs and Madera Irrigation District is defendant.

"(3) Said second parties also agree to defend for first parties any and all condemnation suits or other proceedings that may be entered against them or either of them respecting the said water rights of said river. In other words, the second parties agree to fully represent said first parties as attorneys during the life of this contract in any and all matters affecting the legal status of the water rights that belong to or appertain to the said above mentioned and described lands.

"(4) The said second parties in this behalf agree to give their personal attention to said work; to exercise their best skill and ability in the pursuance thereof and to in every way and in good faith protect to their utmost the rights of the first parties in and to said San Joaquin river and its tributaries.

"(5) It is expressly understood and agreed that this contract be and is unassignable.

"(6) For the services of parties of the second part hereunder, both past and future, it is agreed that the same shall be as follows and not otherwise, to-wit:

"That in case of sale of said property by parties of the first part prior to a decision by the Supreme Court of the State of California upon the appeal now pending therein,

the compensation of said second parties shall be the sum of eighty-five thousand (85,000) dollars and no more.'' [It is to be noted that this compensation clause could not possibly apply, because the termination of plaintiffs' employment occurred after, and not prior to, a decision by this court in the injunction suit.]

''If the above referred to judgment now being appealed from is substantially affirmed but not otherwise and thereafter a sale is made of said property by parties of the first part, the parties of the second part shall receive a minimum compensation of one hundred thousand (100,000) dollars, or in lieu of such sum may at their option require for their said services thirty percent of all sums received on such sale in excess of eight hundred thousand (800,000) dollars and less than two million (2,000,000) dollars.'' [This clause will hereafter be referred to as the sales clause.]

''However, in case any condemnation suit or suits are prosecuted against said parties of the first part and damages are collected by said parties of the first part by compromise or by judgment, compensation for said parties of the second part for their services shall be as follows, and not otherwise:

''Twenty (20) percent of all sums realized in excess of one hundred thousand (100,000) dollars and less than two hundred thousand (200,000) dollars.

''Twenty-five (25) percent of all sums realized in excess of two hundred thousand (200,000) dollars and less than three hundred thousand (300,000) dollars.

''Thirty (30) percent of all sums in excess of three hundred thousand (300,000) dollars.

''It being, however, understood and agreed that if less than one hundred thousand (100,000) dollars is recovered by and paid to parties of the first part, nothing shall be paid to parties of the second part on account of said services.'' [This clause will hereafter be referred to as the condemnation clause.]

Defendants strenuously contend that since the property was sold to the Edison people, the plaintiffs' compensation should be measured by the provisions of the sales clause, *supra*, and not otherwise. It is therefore defendants' contention that the compensation of plaintiffs should be $100,000, and no more, of which $35,000 admittedly has

been paid. The defendants at all times have been and are now willing to pay the balance of $65,000 for a full release of all of plaintiffs' claims under the contract. On the other hand, the plaintiffs, with equal vigor, contend that the sale of the property to the Edison Securities Company was, in effect, no more than a compromise and settlement of all condemnation proceedings, and for that reason the condemnation clause, *supra*, governs the compensation. Under this provision of the contract, if the $260,000 already received by defendants is included as part of the compromise, the compensation of plaintiffs would be $294,960, plus interest, less the $35,000 already received, and less the sum of $500 which appellants paid to an outside attorney. This would fix respondents' fee at $259,460 (erroneously found by the trial court to be $259,400), plus interest; or, using the figures of the trial court, the sum due respondents at the time of judgment was $273,018.50. This was the amount of the verdict of the trial court.

The complaint sets forth three causes of action, only the first being important on this appeal, the plaintiffs electing to rely on this count at the trial. This cause of action sets forth the contract and alleges that the sale of the property was a compromise and settlement of the condemnation suits. During the course of the trial the plaintiffs were permitted to amend this count of the complaint to the effect that the sale was only a disguise for a compromise and settlement of the condemnation suits, thus, in effect, setting forth bad faith. The defendants, in their answer, contend that no compromise was in fact entered into, the transaction being no more than a sale of the property. They deny any bad faith.

The case proceeded to trial before the court and jury. During the course of the trial the court, with the approval of both parties, stated to the jury that there were but two issues of fact involved, to wit: (1) The proper application in determining the amount of fee due the plaintiffs of the $260,000 paid the defendants by the Southern California Edison Company for permission to violate the injunction; (2) whether the termination of the condemnation suits in the manner already set forth was a compromise within the meaning of the contract. After both parties had closed their evidence the plaintiffs made a motion for a directed verdict

for the full amount prayed for in the complaint, plus interest, and less the sum of $500, which amount defendants had paid to an outside attorney. The trial judge granted plaintiffs' motion, and instructed the jury to return a verdict for plaintiffs in the amount specified, together with interest. The jury thereupon returned a verdict in favor of plaintiffs in the sum of $273,018.50. From this judgment defendants prosecute this appeal.

Appellants' principal contentions can be summarized as follows: (1) That, since the entire property of appellants was "sold", the fee of respondents should be measured by the sales clause of the contract, which fixes the fee at $100,000; that since respondents have already admittedly received the sum of $35,000, the balance due is $65,000. (2) That even if the condemnation clause applies, the judgment must be reversed because that clause provides that the fee shall be a percentage based on the "damages" received by way of compromise of or judgment in the condemnation suits, while the verdict of the jury is based on the selling price of the entire property, including the value of the land as distinguished from the value of the water rights, and including the value of one thousand acres of nonriparian land. In this connection appellants contend that the trial court was in error in excluding evidence offered by them of the value of the water rights involved in the condemnation suits. (3) That in the event that neither of the above theories is correct, then a stiuation not provided for in the contract has arisen, and the respondents must recover, if at all, upon a *quantum meruit*.

It is admitted that the contract here involved was entered into after the relationship of attorney and client had come into existence. In such cases the law is well settled that any ambiguity in the contract must be construed in favor of the client and against the attorney. (*Reynolds* v. *Sorosis Fruit Co.*, 133 Cal. 625, 630 [66 Pac. 21]; *Bennett* v. *Potter*, 180 Cal. 736, 740 [183 Pac. 156]; *Boardman* v. *Christian*, 65 Cal. App. 413, 418 [224 Pac. 97].) However, there is no rule of law which makes such contracts void, and, if certain, clear and unambiguous, they will be enforced as any other contract. The rule of interpretation above noted cannot be used to frustrate the obvious intent of the parties. (See *Pinto* v. *Seeley*, 22 Cal. App. 318, 326 [135 Pac. 43].)

■ The first question to be considered is whether, under the facts as herein stated, the sales clause or the condemnation clause applies. Upon reading the contract, we agree with the trial court that the contract clearly and unambiguously provides for the present situation, and that the condemnation clause, and not the sales clause, applies. This is obvious from the very nature of the compensation provisions of the contract. The parties carefully provided for every contingency that might arise, with a corresponding provision for compensation. The provisions are clearly progressive and exclusive. Thus, if the property was sold before affirmance of the injunction suit, respondents were to receive a fee of $85,000. Upon affirmance, however, that clause no longer applied, and the sales clause, providing for a fee of $100,000 in the case of a sale after affirmance, applied. When the defense of the condemnation suits was undertaken by respondents, the condemnation provision of the contract applied, to the exclusion of all other clauses of the contract. That this is the proper interpretation of the contract clearly appears from its express terms, from the practical construction placed on it by the parties, and from an application of the test of reasonable construction, which is, inherently, the fundamental test in the interpretation of all contracts.

The contract expressly provides that once the condemnation suits have been "prosecuted", the condemnation clause, and no other, shall be used in fixing respondents' fee. That clause starts with the word "however" and provides that if condemnation suits are prosecuted against the defendants and damages are collected by compromise or judgment, the compensation "shall be as follows, and not otherwise". The word "however" and the phrase "and not otherwise" are clearly terms of exclusion. They are undoubtedly used as a contrast with the previous compensation provisions, and to exclude them if the condemnation clause applied.

In the case of *Lewis' Appeal*, 18 Pa. St. (6 Harr.) 318, the court was interpreting the meaning of the word "however" as used in a will. The will in question, after devising property to five children of the niece of the testatrix, provided (p. 319): "If one or more of the said children should happen to die before their mother, without leaving any children, the share of such child or children so dying

shall be equally distributed among the survivors of the said brothers and sisters; if, *however* [italics added], such child or children so dying shall leave a child or children, such child or children shall be entitled to their parent's share." Concerning the meaning of the term "however", the court had the following to say (p. 325): " 'However' is most emphatic here, if we keep up the connection of the thought. It indicates an alternative intention, a contrast with the previous clause, and a modification of it under other circumstances. It is thus—I do not however so dispose of the survivorship in the case of those who die leaving children, but such children shall take the share which their parent, if surviving, would have taken." The meaning of the phrase "and not otherwise" in a statute was under consideration in the case of *County of Plumas* v. *Wheeler,* 149 Cal. 758 [87 Pac. 909]. Concerning its meaning this court said (p. 761): "Section 3366 of the Political Code, enacted in 1901, provides that 'Boards of supervisors of the counties of the state . . . shall, *in the exercise of their police powers, and for the purpose of regulation, as herein provided, and not otherwise,* have power to license all and every kind of business not prohibited by law, and transacted and carried on within the limits of their respective jurisdictions . . . ' The effect of this statutory provision was to cut off the power theretofore residing in boards of supervisors under the County Government Act . . . to collect a tax *for revenue.* 'The words "not otherwise" curtail and cut off all power boards of supervisors theretofore had to issue licenses and charge therefor as a revenue measure . . . ' (*Ex parte Pfirrmann,* 134 Cal. 143 [66 Pac. 205].)" It was in this sense that the terms under discussion were undoubtedly used in the contract herein involved. This view is made even clearer by other considerations.

It is a fundamental rule of interpretation that the practical construction placed upon a contract by the parties is admissible to explain any ambiguity that may exist. (*Keith* v. *Electrical Engineering Co.,* 136 Cal. 178, 181 [68 Pac. 598].) If any ambiguity did exist in the contract under consideration, which fact we do not concede, such ambiguity has been fully explained by the construction of the contract by the parties themselves, who, by their actions, have clearly shown that in their opinion the condem-

nation clause had attached. As stated above, after the contract was entered into, and both before and after the condemnation suits had been started and while those suits were pending, there were various divisions of money between appellants and respondents. The money so divided was not for the sale of any riparian land or riparian rights, nor was it technically for damages. It was received by appellants as consideration for permission given the Southern California Edison Company to violate the injunction. The amount paid over a period of years totaled $260,000, of which respondents were paid $35,000. This money was divided under the percentages provided for in the condemnation clause. A simple mathematical calculation will show that if $100,000 is deducted from the total thus received, as provided for in the condemnation clause, and the percentages provided for in that clause applied to the balance, the result will be $35,000. Moreover, Bottoms stated in several letters sent to respondents in which were inclosed checks as part of the payments aggregating $35,000, that the money thus received was being divided under the condemnation clause. The uncontradicted testimony of respondent Preston was to the same effect. This testimony is consistent only with the fact that both appellants and respondents understood that the condemnation provisions had become effective because of the commencement of the condemnation suits, and that the sales clause had been excluded from consideration.

 Under another test, there can be no doubt that the condemnation clause of the contract had attached to the exclusion of the sales clause. If we apply the fundamental test of reasonableness (Civ. Code, sec. 1643; 6 Cal. Jur. 271, sec. 169), no other result can be reached than to hold that the compensation clauses were progressive and exclusive. A reading of the contract shows that the parties provided for all contingencies that might occur, and provided for them in the order they were likely to occur. Obviously, as each step in the proceedings was reached without a termination of the litigation, the respondents would be called upon to do more work, and, accordingly, as was just, fair and reasonable, the compensation provided for became increasingly large. It was contemplated, as it eventually transpired, that condemnation suits would be brought after

the affirmance of the injunction suit, if that should occur. At the time the contract was entered into it could not be determined how many of these condemnation suits the respondents might be called upon to defend. Therefore, the contract expressly provided that the damages recovered in all of them should be added together and the percentages designated in the condemnation clause applied to the total. This was fair and reasonable. An interpretation of the contract that would permit appellants to refer back to the sales clause to fix the compensation, after the condemnation clause had attached and respondents had performed the additional work incident to defending the condemnation suits, would be an unjust and unreasonable construction.

From the foregoing analysis we conclude that the condemnation clause had attached, and that once that clause attached, the sales clause was entirely excluded from consideration. We reach this conclusion from the clear and certain language used in the contract, from the fact that the parties themselves have so interpreted the contract, and for the further reason that any other interpretation would be unjust and unreasonable.

█ Appellants' second contention is that the percentages in the condemnation clause shall be applied only to "damages" received by way of compromise of or judgment in the condemnation suits, and that the jury in this case based its verdict upon the selling price of the entire property, including the value of the land as distinguished from the value of the water rights, and including the value of 1,000 acres of nonriparian land. █ In this connection appellants contend that the trial court was in error in excluding evidence offered by them of the value of the water rights involved in the condemnation suits. We cannot follow the logic of these contentions. It seems clear to us that the practical result is the same whether the $873,200 is called "price", or whether it is called "damages". Whatever view is adopted, the sale of the entire property to the Edison Securities Company, from a practical standpoint, amounted to a compromise and settlement, not only of the two condemnation proceedings then pending, but of all condemnation proceedings that might later have been brought. This was the view of the trial court.

Furthermore, it clearly appears that it was the water rights that were primarily involved in the sale. From our

familiarity with the record on appeal in the injunction case, and from an examination of the findings in that case introduced in evidence in this case, we know that the property, with the exception of the 1,000 acres of nonriparian land, gains its principal value from the water rights inseparably connected therewith. When the Southern California Edison Company decided to purchase the property it was primarily interested in the water rights, and not in the land. The only object in purchasing the land was that it was, in the opinion of the purchaser, the most feasible way of securing the water rights. Mr. Brackenridge, the representative of the Southern California Edison Company who consummated the deal with Bottoms and who was produced as a witness for defendants, testified as follows on cross-examination: "Q. What would you have paid, if anything, for the Herminghaus land without the water right? A. I suppose I have got to answer the question. *It is self-evident that we would not have taken the ranch if they had given it to us without the water right.* Q. It is perfectly valueless to you without the water right? A. Yes, we are not in the farming business. Q. And you took this land to get the water right? A. Yes, sir. Q. And for no other reason? A. That is all." [Italics ours.] Mr. Brackenridge further testified that one of the reasons that the land was purchased was that thereby the Southern California Edison Company would be substituted for the Herminghaus people so far as other diverters and appropriators were concerned. In fact, before Brackenridge closed the deal with Bottoms he had secured a contract from the San Joaquin Water Storage District to sell them part of the water right for $265,000. Appellants constantly refer to "water rights" as if such rights existed separate and distinct from the land. It must be remembered that whatever water rights the appellants possessed were wholly riparian in nature. Therefore there was no such thing as a water right separate and distinct from the land itself. (*Duckworth* v. *Watsonville*, 150 Cal. 520, 526 [89 Pac. 338]; Id., 158 Cal. 206, 216 [110 Pac. 927].) The purchase price received was for riparian land, in which land and water were inseparably connected.

Even if the value of the water right could, for the purpose of the contract, be separated from the value of the

land, it must be remembered that appellants, by their own acts, have forever rendered it impossible to distinguish in that particular sale what portion, if any, of the moneys received should be credited to the lands. Obviously, evidence of the value of the water rights involved in the condemnation suits was not admissible, nor, in fact, would evidence of the value of the entire water right have been admissible, for the reason that the contract provided for percentages *upon what was received,* not what should have been received. To have admitted such evidence would have been for the court to make a new and different contract for the parties. Neither the seller nor the purchaser valued the land separately. Whatever confusion exists, therefore, was due to the acts of the appellants in making such a sale without allocating a value to the rights upon which respondents' compensation was to be based. In such a situation the law is well settled that the party causing the intermixture must stand the loss. (*"The Idaho",* 93 U. S. 575 [23 L. Ed. 978].) See, also, *Huff* v. *Hardwick,* 19 Colo. App. 416 [75 Pac. 593], where the situation was quite similar to the one involved here. In this case the appellants have, by their own act, converted the land and water into money, and the proportions received for each cannot be ascertained.

Another analogy exists in the law which appears to be applicable to the situation here involved. In actions for damages for infringement of a patent and an accounting of the profits, where the profit attributable to the use of the trademark cannot be segregated from the profit due to the merit of the goods, the law is well settled that the plaintiff is entitled to the entire profit. As was said in the case of *Dickinson* v. *O. & W. Thum Co.,* 8 Fed. (2d) 570, at page 573: "The infringor must account for the entire profits derived from the sale of the infringing goods. The recovery will not be limited to such amount as can be shown by direct and positive evidence to have resulted from the use of the infringing mark." In *William Wrigley, Jr., Co.* v. *L. P. Larson, Jr., Co.,* 5 Fed. (2d) 731, at page 739, the court quoted with approval the following language from *Graham* v. *Plate,* 40 Cal. 593, 598 [6 Am. Rep. 639] : "In sales made under a simulated trademark it is impossible to decide how much of the profit resulted from the intrinsic value of the commodity in the market, and how much from

the credit given to it by the trademark. In the very nature of the case it would be impossible to ascertain to what extent he could have effected sales and at what prices, except for the use of the trademark. No one will deny that on every principle of reason and justice the owner of the trademark is entitled to so much of the profit as resulted from the use of the trademark . . . it is more consonant with reason and justice that the owner of the trademark should have the whole profit, than that he should be deprived of any part of it by the fraudulent act of the defendant. It is the same principle which is applicable to the confusion of goods.''

For the foregoing reasons, the judgment appealed from should be and is affirmed.

Mr. Justice Preston did not participate in the foregoing opinion.

Rehearing denied.