[Civ. No. 18043. First Dist., Div. One. Apr. 20, 1959.]

ABRAHAM SETZER, Appellant, v. ALL STEEL ENGINES, INC. (a Corporation), et al., Respondents.

George B. White for Appellant.

Fred A. Watkins, in pro. per., and Bernard G. Glickfeld for Respondents.

WOOD (Fred B.), J.—In this action, based upon a contingent fee contract, plaintiff asserts a one-fourth interest in certain properties acquired by All Steel Engines, Inc., and George A. Selig from Taylor Engines, Inc., allegedly acquired as a "recovery" by way of settlement, upon a judgment against Taylor Engines which defendant Fred A. Watkins, as attorney for Selig and All Steel, obtained and plaintiff and Watkins were thereafter employed, as attorneys, to enforce.

The judgment, obtained by All Steel and Selig against Lloyd Taylor, Taylor Engines and certain officers of Taylor Engines, decreed and declared: (1) Selig owns a one-half interest in certain patents; (2) All Steel has an exclusive license to make, use and sell under these patents; (3) Taylor Engines et al. have infringed the rights of Selig and All Steel by entering into a contract with Crosley Motors, Inc., in connection with the invention covered by these patents; (4) a perpetual injunction shall issue restraining further infringement; (5) All Steel to recover damages suffered and profits which Taylor Engines et al. have made by their infringements; (6) that an accounting be had; and (7) that Lloyd Taylor (who had defaulted) pay All Steel $38,500. (See *All Steel Engines* v. *Taylor Engines*, 88 F.Supp. 745, decided March 3, 1950; affirmed in 192 F.2d 171, decided October 26, 1951, rehearing denied December 5, 1951.)

Defendant Fred A. Watkins represented All Steel and Selig throughout the course of that litigation.

January 30, 1952, All Steel entered into a contract em-

ploying Fred A. Watkins and plaintiff Abraham Setzer, attorneys, "in the matter of the enforcement of that certain judgment" above described "to fully represent us in the recovery of all moneys due us thereunder from said judgment debtors and/or other persons . . . liable or indebted to us by reason of said judgment," including $38,500, with interest, from Lloyd Taylor, "and the profits and damages to be ascertained and determined, due from . . . Taylor Engines . . ."

In "consideration of services rendered and to be rendered . . . by our said attorneys" All Steel promised to pay them 50 per cent of "the net recovery or recoveries, whether achieved by suit, settlement or otherwise, in money or in kind . . . assigning to our said attorneys so much of the proceeds of any such recovery or recoveries as shall equal their share thereof . . . If there be no recovery or recoveries we are not to be liable, responsible or indebted to our said attorneys for their legal services rendered or to be rendered herein . . ."

In February, 1952, the proceeding for an accounting commenced before a special master and continued until the latter part of 1952, when the master died without a report having been rendered. Proceedings for the collection of the money judgment against Lloyd Taylor were conducted meanwhile, culminating in January, 1953, with the payment of $20,000 by him in satisfaction of the $38,500 award.* Plaintiff and Watkins each received his full share (25%) of that recovery.

Thereafter, nothing tangible was done toward enforcing the judgment against the other defendants. There was no resumption of the proceedings for an accounting either before a master or before the court. No such matter was ever brought to the attention of the court for consideration and action. There never was any adjudication of damages against these other defendants. No such steps were taken during the years 1953-1956, inclusive. No money judgment was ever entered against any of the defendants other than Lloyd Taylor even though, as testified by plaintiff, "the very purpose of my employment was to enforce the judgment with regard to those other defendants and to have it reduced to a formal judgment in dollars and cents."

Plaintiff said he wanted these things done and conferred many times with Mr. Watkins and wrote letters to Mr.

---

*It was expressed in the form of a covenant not to sue, thus avoiding extinction of the obligations of the other defendants.

Watkins urging that they be done. He asserted that any lack of activity in respect to enforcing the judgment was not his fault because Watkins from the beginning instructed plaintiff to confer with Watkins as to every step to be taken. Accordingly, plaintiff submitted his every proposal to Watkins and never received from Watkins carte blanche to carry on in his own way. Because Watkins had been attorney for All Steel for many years, plaintiff felt that he himself was merely an associate in the matter and had no prerogative to act upon his own initiative. Plaintiff said he never had authority from Watkins, before or after the settlement with Lloyd Taylor, to proceed upon his own.

However, Watkins testified that in January, 1953, he advised plaintiff that if the latter wanted to go ahead with these supplemental proceedings he could do so, but that in Watkins' opinion "there was nothing in it in the way of infringement . . ." He said he told plaintiff on many occasions it was plaintiff's job. "I didn't need him to tell me how to conduct my case in court. It was his job. He was a bill collector, to enforce a judgment, and that was what he was hired for, and I told him that many times, and all these letters show a cunning to build up a case some day which he might profit by." Watkins said he told plaintiff it was plaintiff's "job to go ahead and do this thing, not be bothering me about it. As far as I was concerned, there was nothing more to be recovered . . . After all this money was paid to him [plaintiff's share of the recovery from Lloyd Taylor], he dropped it and he wouldn't do anything, but yet he wrote these letters to me, telling me what to do."

Meanwhile, negotiations were going on for a merger of the interests of All Steel and Taylor Engines in the exploitation of the patents involved. Defendant Alfred Gorman, secretary of Taylor Engines, testified that for over ten years (commencing in November, 1946) he had had discussions with Mr. Watkins, on not less than ten occasions, in respect to the purchase of the interests involved and the taking over by his company of the things ("patent interest and so on") that qualified All Steel and Selig in their suit against Taylor Engines. Asked if they were not discussing settlement of the litigation, he said "That was the basis of our litigation. Without the patents, there would have been no patent infringement claims, and without the license agreement to All Steel Engines, there wouldn't be any claim for damages, therefore, we had to negotiate the fundamental reason for

our problems. In other words, we had to acquire those in order to own the patents and the license agreement, free and clear of any problem." The basis of negotiation changed from day to day. "It was give and take. We were trying to buy as best we could and they were trying to sell as best they could." At first "they wanted 90% of the ultimate business to be had, and we finally broke that down to a purchase on approximately a 50-50 basis." The witness added "We had to buy those patents, we had to obtain that license agreement, and ours was merely an exchange of assets. We bought from George Selig his interest in three patents. We bought from All Steel . . . the license agreement" which by including "improvements" affected other patents held by Taylor Engines.

Gorman said the common stock of Taylor Engines "is completely worthless. What its speculative value is is something I can't forecast." He recalled no sales around the time of this agreement. He did not think there was any bid of any kind. During the entire period of 1940 to 1956 Taylor Engines had no income. It was never in the black during any month of that period. The source of its funds had been the sale of its stock and occasional loans from the witness or from someone else interested in the company. But as to the patents, certain engineering reports indicated that the invention has a high potential value. On the books of Taylor Engines this transaction as finally consummated would appear as a $75,000 increase on the liability side ($1.00 par value of its common stock) and a like increase on the assets side, as the cost of obtaining the patent rights and interests.

These negotiations culminated in an agreement dated February 10, 1956, pursuant to which Selig and All Steel conveyed to Taylor Engines all of their interests in the patents and licenses; Taylor Engines issued to Selig and to All Steel 75,000 shares of its common stock; Taylor Engines agreed that All Steel and Taylor Engines will share equally in any proceeds derived from Crosley Corporation or Crosley Motors, Inc., in respect to license agreements between Taylor and Crosley, after deducting 10 per cent for cost of collection. As a part of this transaction Selig and All Steel released Taylor Engines, its officers and agents, from any and all claims of liability (except said one-half share of Crosley royalties), executed satisfaction of the judgment mentioned, obtained dismissal of the perpetual injunction and stipulated

for withdrawal of exhibits that had been introduced in evidence. Taylor Engines declared its intention to elect Selig a member of its board of directors.

The trial court found that the issuance of the 75,000 shares of stock and the transfer of the licenses and patents was an exchange of assets, not a recovery by All Steel against Taylor Engines under the contingent fee agreement of January 30, 1952, whereby All Steel employed plaintiff and Watkins as attorneys to enforce the judgment.

The court also found that at the time of this exchange of assets Taylor Engines had no income and no cash and its stock had no value; its patent development was an asset of extremely speculative value; the patents and licenses acquired from All Steel had potential value; this exchange was not the result of performance by plaintiff of his contingent fee contract; plaintiff has not fully performed his contingent fee contract; he took no action or course of conduct to enforce the judgment after January 9, 1953, and on or about said date abandoned said contract.

The evidence furnishes sufficient support for these findings. Watkins' belief that further pursuit of the defendants (after the $20,000 collection from Lloyd Taylor) would be unprofitable and his inactivity after 1952 did not excuse plaintiff's inactivity during that period, did not convert plaintiff's inactivity into performance of his duty toward his principal, All Steel. Moreover, the trial court presumably believed Watkins' testimony that after receiving his fee for collecting the $20,000 from Lloyd Taylor plaintiff "dropped it and . . . wouldn't do anything," despite what he said in his letters to Watkins.

Plaintiff could not thus stand idly by for three years and then, when his client effected a solution of its problem by merging its assets with those of Taylor Engines more effectively to exploit the invention, claim the fruits of the merger as "recovery" under the judgment which he was employed to enforce but did not. Also, we can not say as a matter of law that this was a mere settlement of a lawsuit and that the corporate stock and the right to a portion of the Crosley royalties were not acquired by way of exchange of assets. The amount and collectibility of the Crosley royalties have not been shown. They may be of no real value. Watkins said he thought the royalties had been "outlawed." The patent rights have a potential value. The development of the invention, if successful, appears to furnish the only basis

for the shares of stock acquiring any monetary value. It is a fair inference that transfer of the patent interests furnished amply adequate consideration for the corporate stock and the half-interest in the Crosley royalties.

 Plaintiff further claims that he was prejudicially hampered in his endeavor to show that his activities in 1952 were not confined to enforcement against Lloyd Taylor but were directed toward enforcement of the judgment against the other defendants as well. He complains particularly of the sustaining of objections to offers to introduce copies of various documents which he prepared and submitted to the court of the special master during the course of the supplemental proceedings. Those rulings, if erroneous, were not prejudicial, for plaintiff later described those activities, by his own testimony, as fully and as adequately as those documents would have done.

 Plaintiff attaches considerable significance to a recital in the agreement of February 10, 1956, that "the parties hereto are desirous of settling all their differences to the end that all pending litigation be concluded and that their respective patent interests be commercially exploited to the mutual advantage of all of the parties." He emphasizes the words "pending litigation be concluded" and says that a mere reading of the agreement makes it "self-evident" that the agreement was a settlement contemplated by the contingent fee contract. We are not convinced that it is thus so readily self-evident. Those words should be read in their context. The parties declare they are desirous of settling "all their differences." This they do for the *dual* purpose of bringing "pending litigation" to an end and of commercially exploiting "their respective patent interests . . . to the mutual advantage of all . . ." The trial court, with good reason as we have seen, viewed the latter as the dominant purpose. Moreover, even if this recital in the agreement were of different import the parties to this action would not be bound by it, for the controversy here is not "between the parties" to the contract. (Code Civ. Proc., § 1856. See also 18 Cal.Jur.2d 749-750, Evidence, § 264.)

During the oral argument this court suggested that counsel consider *Preston* v. *Herminghaus,* 211 Cal. 1 [292 P. 953]. and give us the benefit of their views concerning the applicability of that case to the instant case. That counsel have done. It is our conclusion that the Preston case is not particularly helpful. It differs in important respects. There,

it was conceded by the clients that the attorneys had completely performed their part of the contract. It was then a question which of various measures of compensation specified in the contract of employment governed when the client sold the land after condemnation suits had been filed.

The judgment is affirmed.

Bray, P. J., and Hanson, J. pro tem.,* concurred.

A petition for a rehearing was denied May 13, 1959, and appellant's petition for a hearing by the Supreme Court was denied June 18, 1959. Peters, J., did not participate therein.

*Assigned by Chairman of Judicial Council.