[No. B182250. Second Dist., Div. Three. Sept. 20, 2006.]

FREMONT INDEMNITY COMPANY, Plaintiff and Respondent, v.
FREMONT GENERAL CORPORATION et al., Defendants and Appellants.

## COUNSEL

Pachulski, Stang, Ziehl, Young, Jones & Weintraub, Iain A.W. Nasatir, James K.T. Hunter; Greines, Martin, Stein & Richland, Kent L. Richland, Marc J. Poster and Tillman J. Breckenridge for Defendants and Appellants.

Munger, Tolles & Olson, Mark Epstein and Marc T.G. Dworsky for Los Angeles County Bar Association as Amicus Curiae on behalf of Defendants and Appellants.

Bill Lockyer, Attorney General, W. Dean Freeman, Mark P. Richelson and Raymond B. Jue, Deputy Attorneys General; Orrick, Herrington & Sutcliffe, Thomas J. Welsh, James E. Houpt and Stacy E. Don for Plaintiff and Respondent.

## OPINION

**CROSKEY, Acting P. J.**—Fremont General Corporation (Fremont General), Fremont Compensation Insurance Group, Inc. (Insurance Group), and Fremont Indemnity Company (Indemnity) are related corporations each of which retained the law firm of Morgan, Lewis & Bockius (MLB) in the past. Indemnity, by and through the Insurance Commissioner as its liquidator, sued Fremont General and Insurance Group in two separate actions alleging the misappropriation of funds. MLB appeared as counsel for defendants in both actions. The superior court granted Indemnity's motions to disqualify MLB as counsel for defendants. Defendants appeal the disqualification orders. Defendants contend the disqualification of counsel is not justified based on either the concurrent representation of parties with conflicting interests or the successive representation of adverse parties in substantially related matters. We agree and reverse the orders.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1. *Factual Background*

Indemnity is a wholly owned subsidiary of Insurance Group, which is a wholly owned subsidiary of Fremont General. MLB represented Fremont General and its subsidiaries for many years. MLB represented Indemnity in a legal malpractice action (*Fremont Indemnity Co. v. Seyfarth Shaw* (Super. Ct. L.A. County, 2005, No. BC287943)) known as the *Seyfarth* action. In that action, Indemnity alleged that Seyfarth Shaw had failed to timely file a complaint for legal malpractice against another law firm arising from the latter law firm's representation of Indemnity in connection with a workers' compensation claim. MLB filed a complaint on behalf of Indemnity in December 2002. Fremont General was not a party to the *Seyfarth* action.

MLB also represented Fremont General in *Gularte v. Fremont Life Insurance Co.* (Super. Ct. L.A. County, 2004, No. BC193703), known as the *Gularte* action, beginning in late 2002. The subject matter of that action does not appear in the appellate record. Indemnity was not a party to the *Gularte* action.

The commissioner filed an application to be appointed conservator of Indemnity on June 3, 2003. The court appointed the commissioner as conservator on June 4, 2003, and appointed the commissioner as liquidator on July 2, 2003. Harry J. LeVine, as counsel for the commissioner, first spoke with Michael C. Lieb of MLB concerning the *Seyfarth* action in June 2003, and the two later discussed the possibility of MLB continuing to represent Indemnity in that action. Paul A. Richler of MLB provided a proposed retainer agreement to LeVine on November 10, 2003, including language stating that MLB could continue to represent existing clients and could represent new clients in any matter that was not substantially related to the *Seyfarth* action, "even if the interests of such clients in those matters are directly adverse to those of the [California Department of Insurance]." LeVine objected to that provision, and the parties were unable to reach a compromise. LeVine advised Richler in December 2003 that he had selected other counsel to represent Indemnity in the *Seyfarth* action. MLB executed a substitution of counsel form on January 12, 2004.

Meanwhile, the commissioner's counsel met with counsel for Fremont General, including its general counsel and Iain Nasatir of Pachulski, Stang, Ziehl, Young, Jones & Weintraub (Pachulski firm), on November 21, 2003. At the meeting, the commissioner requested compensation for Fremont General's use of certain net operating losses and threatened litigation. We will refer to the dispute concerning Fremont General's use of net operating losses incurred by Indemnity as the NOL dispute.

## 2. *Trial Court Proceedings in the NOL Action*

Indemnity filed a complaint against Fremont General and Insurance Group on June 2, 2004 (No. BC316472) (NOL action). MLB appeared on behalf of the defendants. Indemnity's first amended complaint filed on July 16, 2004, alleged that Fremont General had appropriated Indemnity's net operating losses without adequate compensation. Indemnity alleged 12 counts against defendants, including counts for declaratory and injunctive relief, breach of contract, breach of fiduciary duty, unjust enrichment, breach of the implied covenant of good faith and fair dealing, fraudulent concealment, avoidance of voidable preferences, avoidance of fraudulent transfers, and violation of the Insurance Holding Company System Regulatory Act (Ins. Code, § 1215 et seq.).

Indemnity moved to disqualify MLB as counsel for Fremont General and Insurance Group on August 13, 2004. Indemnity argued that, through MLB's prior representation of Indemnity in the *Seyfarth* action, MLB had learned the strengths, weaknesses, and other confidences of Indemnity. Indemnity also argued that Fremont General "almost certainly" had consulted MLB before rejecting the possibility of a settlement with respect to the NOL dispute in November 2003. Indemnity argued that MLB had refused to disclose when it first agreed to represent Fremont General in connection with the NOL dispute and that MLB's refusal to disclose that information compelled the conclusion that the representation began at a time when MLB continued to represent Indemnity in the *Seyfarth* action. Based on those purported facts, Indemnity argued that MLB had concurrently represented parties with conflicting interests without informed written consent, in violation of rule 3-310(C)(3) of the State Bar Rules of Professional Conduct.[1]

Indemnity also argued that MLB's representation of Fremont Indemnity in the present action was "substantially related" to its representation of Indemnity in the *Seyfarth* action. Indemnity argued that despite the dissimilar facts and legal issues in the two actions, MLB had gained "insight into the tolerance of risk, and attitudes toward costs of pursuing litigation in light of the relative strength of the case for Fremont Indemnity" through its representation of Indemnity in the *Seyfarth* action and "became privy to the Commissioner's litigation philosophy and practices." Indemnity argued that MLB had accepted employment adverse to Indemnity as a former client in violation of rule 3-310(E).

---

[1] All further rule references are to the State Bar Rules of Professional Conduct unless stated otherwise.

Fremont General and Insurance Group argued in opposition that Indemnity's claim that MLB had concurrently represented parties with conflicting interests was based on mere speculation that MLB had represented Fremont General and Insurance Group in connection with the NOL dispute before MLB was substituted out as counsel for Indemnity in January 2004. Fremont General and Insurance Group filed several declarations to show that such speculation was baseless. A declaration by Richler stated that he was the MLB attorney responsible for Fremont General matters, that Fremont General did not seek advice from MLB concerning the NOL dispute before rejecting the possibility of settlement in or about November 2003, and that no MLB attorney had advised Fremont General or Insurance Group "concerning any aspect of the subject matter of the *NOL Action*" before June 2004.

A declaration by Alan Faigin, general counsel of Fremont General and Insurance Group, stated that he had made the decision on behalf of Fremont General and Insurance Group to hire the Pachulski firm to represent those two entities in connection with the conservatorship proceeding, that "MLB was not consulted on any matter pertaining to the November 21, 2003 meeting with the Insurance Commissioner, or the issues raised in that meeting," that the Pachulski firm and Barger & Wolen were the only outside counsel who had advised Fremont General or Insurance Group with respect to that meeting, and that he first consulted with MLB on behalf of Fremont General and Insurance Group with respect to the NOL dispute on June 3, 2004. A declaration by David Brody, assistant general counsel of Fremont General and Insurance Group, also stated that MLB was not consulted on any matter pertaining to the meeting of November 21, 2003, and had provided no advice to Fremont General or Insurance Group with respect to the NOL dispute until after the NOL action was filed in June 2004.

Fremont General and Insurance Group also argued that a substantial relationship exists between a former representation and a current representation only if there is some similarity between the factual and legal issues involved in the two matters, and that an attorney's mere familiarity with a client from a prior representation is not a sufficient basis to disqualify the attorney from representation of an adverse party in a later unrelated matter.

Indemnity argued in reply that MLB had withheld documents that would disclose "the extent of [MLB's] conflicts" and had failed to answer Indemnity's prior request for information as to "the dates and circumstances under which you were first contacted to provide representation to Fremont

General adverse to Fremont Indemnity and/or the Commissioner."[2] Indemnity noted that MLB's representation of Fremont General in the *Gularte* action, which was referenced in a declaration filed in opposition to the disqualification motion, had occurred concurrently with MLB's representation of Indemnity in the *Seyfarth* action, at a time when the two parties had conflicting interests with respect to the NOL dispute. Indemnity argued that MLB therefore had concurrently represented parties with conflicting interests, in violation of rule 3-310(C).

The court granted the motion to disqualify in a minute order dated January 25, 2005, stating: "MLB's simultaneous representation of Fremont Indemnity and Fremont General post-liquidation when they became adverse mandates this result. The Insurance Commissioner never consented in writing to waive the conflict. MLB have not shown when they were initially consulted regarding representation of Fremont General in matters adverse to the Insurance Commissioner."[3] Fremont General and Insurance Group challenged the order by petitioning this court for a writ of mandate and also appealed the order. We denied the writ petition in April 2005 (*Fremont General Corp. v. Superior Court* (B181557, Apr. 20, 2005)).

### 3. *Trial Court Proceedings in the Comstock Action*

Indemnity commenced a second action against Fremont General and Insurance Group on August 27, 2004 (No. BC320766) (Comstock action). Indemnity alleged that it was the successor in interest to Comstock Insurance Company (Comstock) and that Fremont General had misappropriated assets of Indemnity and Comstock, including net operating losses and other assets. Indemnity alleged 12 counts against defendants, including counts for declaratory and injunctive relief, breach of contract, breach of fiduciary duty, unjust enrichment, constructive trust, conversion, avoidance of fraudulent transfers, avoidance of voidable preferences, and violation of the Insurance Holding

---

[2] The Attorney General on behalf of the commissioner and Fremont Indemnity requested the information in a letter to MLB dated July 8, 2004. The letter stated that MLB's prior representation of Fremont Indemnity created a conflict of interest and requested the information "so that Fremont Indemnity and the Commissioner as liquidator can assess any potential damage caused by this conflict of interest." MLB responded by challenging the assertion of a conflict of interest and stated that the Attorney General had no right to the information requested. The Attorney General did not request leave of court to conduct limited discovery on the matter.

[3] In the same minute order, the court sustained without leave to amend defendants' demurrers to all causes of action alleged in the first amended complaint except the count for fraudulent concealment, as to which the court sustained a demurrer with leave to amend. The court later sustained demurrers to all counts alleged in Indemnity's third amended complaint and entered a judgment of dismissal in January 2006. Indemnity's appeal from the judgment is currently pending in this court (*Fremont Indemnity Co. v. Fremont General Corp.* (B188900, app. pending).

Company System Regulatory Act. MLB appeared on behalf of defendants. Indemnity moved to disqualify MLB as counsel for Fremont General and Insurance Group on March 30, 2005, arguing that disqualification was required for the same reasons that disqualification was required in the NOL action. Fremont General and Insurance Group opposed the motion.

The court granted the disqualification motion in a minute order dated April 22, 2005, stating: "Consistent with this Court's previous ruling in related case BC316472, the Motion to Disqualify is granted. MORGAN, LEWIS & BOCKIUS' simultaneous representation of Fremont Indemnity and Fremont General post-liquidation when they became adverse mandates this result. The Insurance Commissioner never consented in writing to waive the conflict. MLB still have refused to reveal how and when they were initially consulted regarding representation of Fremont General in matters adverse to the Insurance Commissioner. Further, there is also prohibited successive representation. MLB had a substantial relationship with the client (see Levin's first and second declarations) and this creates a presumption that confidential information was obtained and this [is] a conflict. See Jessen vs. Hartford (2003) 111 Cal.App.4th 698 [3 Cal.Rptr.3d 877]."[4] Fremont General and Insurance Group appealed the order. We have consolidated the two appeals.

## CONTENTIONS

Fremont General and Insurance Group contend (1) MLB's concurrent representation of clients in two unrelated matters in which the clients' interests did not conflict (Indemnity in the *Seyfarth* action and Fremont General in the *Gularte* action) at a time when a conflict of interest existed between those clients with respect to a third matter in which MLB did not represent either party (the NOL dispute) is not a proper basis for disqualification; and (2) MLB's prior representation of Indemnity in the *Seyfarth* action is not substantially related to its representation of defendants in these actions, and there is no reason to believe that in that prior representation MLB obtained confidential information material to the present dispute.

Indemnity contends disqualification is required because (1) MLB concurrently represented both Indemnity in the *Seyfarth* action and Fremont General in the *Gularte* action at a time when the interests of Indemnity in liquidation conflicted with those of Fremont General with respect to the NOL dispute and

---

[4] In the same minute order, the court sustained without leave to amend defendants' demurrers to all causes of action alleged in the complaint. Indemnity's appeal from the resulting judgment of dismissal is currently pending in this court (*Fremont Indemnity Co. v. Fremont General Corp.* (B183974, app. pending)).

the alleged misappropriation of assets, without the informed written consent of both parties; (2) MLB's representation of defendants in the present actions is substantially related to its representation of Indemnity in the *Seyfarth* action, despite the dissimilarity of issues, because MLB attorneys in the *Seyfarth* action had a "direct" and "personal" relationship with LeVine as counsel for the commissioner and "became privy to the Commissioner's litigation philosophy and practices"; and (3) MLB gained confidential information by interviewing Indemnity's officers and employees in the course of its prior representation of Indemnity in numerous matters.

## DISCUSSION

### 1. *General Principles Governing the Disqualification of Counsel*

■ "A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' (Code Civ. Proc., § 128, subd. (a)(5); *People* ex rel. *Clancy v. Superior Court* (1985) 39 Cal.3d 740, 745 [218 Cal.Rptr. 24, 705 P.2d 347]; *Comden v. Superior Court* [1978] 20 Cal.3d [906,] 916, fn. 4 [145 Cal.Rptr. 9, 576 P.2d 971]; *In re Complex Asbestos Litigation* [1991] 232 Cal.App.3d [572,] 585 [283 Cal.Rptr. 732].) Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. (*Comden v. Superior Court, supra*, 20 Cal.3d at p. 915.) The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process. *Ibid.*; (*In re Complex Asbestos Litigation, supra*, 232 Cal.App.3d at p. 586; *River West, Inc. v. Nickel* [(1987)] 188 Cal.App.3d [1297,] 1306–1308 [234 Cal.Rptr. 33]; see 1 Hazard & Hodes, The Law of Lawyering [(2d ed. 1996)] § 1.7:101, pp. 223–225 [discussing the assumed function of automatic disqualification rules in maintaining public confidence in the legal system].)" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145–1146 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee*).)

Other factors to consider in deciding a motion to disqualify counsel include the attorney's interest in representing the client, the financial burden on the client to replace disqualified counsel, and the possibility that the disqualification motion is being used as a litigation tactic. (*SpeeDee, supra*, 20 Cal.4th at p. 1145; *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 300–301 [254 Cal.Rptr. 853].)

## 2. *Standard of Review*

We review the ruling on a motion to disqualify counsel generally for abuse of discretion. (*SpeeDee, supra,* 20 Cal.4th at p. 1143.) The scope of the trial court's discretion is limited by the applicable principles of law. (*Id.* at p. 1144; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704].) We defer to the court's express or implied factual findings if substantial evidence supports the findings and reverse the ruling only if it does not conform to the applicable legal principles or there is no reasonable basis for the ruling in light of the facts. (*SpeeDee, supra,* at p. 1144; *Jackson v. Ingersoll-Rand Co.* (1996) 42 Cal.App.4th 1163, 1166–1167 [50 Cal.Rptr.2d 66]; *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at p. 585 ["if substantial evidence supports the trial court's implied findings of fact, an appellate court reviews the conclusions based on the findings for abuse of discretion"].) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. [Citations.]" (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339].) An appellate court must carefully review the trial court's exercise of discretion on a motion to disqualify counsel due to the important interests at stake. (*SpeeDee, supra,* at p. 1144.)

## 3. *Disqualification Is Not Justified Based on the Concurrent Representation of Parties with Conflicting Interests*

■ An attorney's concurrent representation of parties with conflicting interests implicates the duty of loyalty. "Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process. (See *Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 547–548, fn. 6 [28 Cal.Rptr.2d 617, 869 P.2d 1142] and accompanying text.) The effective functioning of the fiduciary relationship between attorney and client depends on the client's trust and confidence in counsel. (*Flatt* [*v. Superior Court* (1999)] 9 Cal.4th [275,] 282, 285 [36 Cal.Rptr.2d 537, 885 P.2d 950].) The courts will protect clients' legitimate expectations of loyalty to preserve this essential basis for trust and security in the attorney-client relationship. (*Ibid.*)" (*SpeeDee, supra,* 20 Cal.4th at pp. 1146–1147.)

Rule 3-310(C) prohibits the concurrent representation of clients in certain circumstances without the informed written consent of each client. The rule states: "A member shall not, without the informed written consent of each

client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or [¶] (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." (Rule 3-310(c).)

■ The most egregious conflict of interest occurs when an attorney represents more than one client in a matter in which their interests are directly adverse. (*SpeeDee, supra*, 20 Cal.4th at p. 1147; *Flatt v. Superior Court, supra*, 9 Cal.4th at p. 284, fn. 3.) "Such patently improper dual representation suggests to the clients—and to the public at large—that the attorney is completely indifferent to the duty of loyalty and the duty to preserve confidences. However, the attorney's actual intention and motives are immaterial, and the rule of automatic disqualification applies. 'The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct,' but also to keep honest attorneys from having to choose between conflicting duties, or being tempted to reconcile conflicting interests, rather than fully pursuing their clients' rights. (*Anderson v. Eaton* (1930) 211 Cal. 113, 116 [293 P. 788].) The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another. (*Ishmael v. Millington* (1966) 241 Cal.App.2d 520, 526–527 [50 Cal.Rptr. 592].)" (*SpeeDee, supra*, at p. 1147.)

■ A conflict of interest also arises when an attorney represents a client in a matter in which the client's interests are adverse to those of another party and concurrently represents the other party in another matter. This is the situation described in rule 3-310(C)(3). An attorney's dual representation of parties in those circumstances presents a conflict of interest even if the two matters are completely unrelated and there is no risk that confidences obtained in one matter could be used in the other. (*SpeeDee, supra*, 20 Cal.4th at p. 1147; *Flatt v. Superior Court, supra*, 9 Cal.4th at pp. 284–285.) ■ *Flatt* explained why the rule of automatic disqualification applies in those circumstances: "A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship. All legal technicalities aside, few if any clients would be willing to suffer the prospect of their attorney continuing to represent them under such circumstances. As one commentator

on modern legal ethics has put it: 'Something seems radically out of place if a lawyer sues one of the lawyer's own present clients in behalf of another client. Even if the representations have nothing to do with each other, so that no confidential information is apparently jeopardized, the client who is sued can obviously claim that the lawyer's *sense of loyalty* is askew.' (Wolfram, Modern Legal Ethics (1986 ed.) § 7.3.2, p. 350, italics added.) It is for that reason, and not out of concerns rooted in the obligation of client confidentiality, that courts and ethical codes alike prohibit an attorney from simultaneously representing two client adversaries, even where the substance of the representations are unrelated." (*Flatt v. Superior Court, supra,* 9 Cal.4th at p. 285.)

█ These concerns about maintaining the trust and confidence of clients, and of the public in general, and preventing a situation where an attorney may be forced to choose between conflicting duties or be tempted to reconcile the clients' conflicting interests are limited to circumstances where an attorney represents one or both of the clients in a matter in which the clients' interests are adverse. This is reflected in rule 3-310(C)(1), (2), and (3), which prohibits the representation of clients with conflicting interests without informed written consent only in circumstances where an attorney concurrently represents one or both clients in a matter in which the clients' interests are adverse. Rule 3-310(C)(1) and (2), which is not directly at issue here, expressly are limited to situations where an attorney concurrently represents more than one client in a matter in which the clients' interests potentially or actually conflict. Rule 3-310(C)(3), which is directly at issue here, states that an attorney may not "[r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." The "client in the first matter" is the client who is represented by the attorney in that matter, as referenced at the beginning of the quoted language. Thus, rule 3-310(C)(3) expressly is limited to situations where an attorney represents a client in a matter while concurrently representing in another matter a second client whose interests in the first matter are adverse to those of the first client. Rule 3-310(C)(3) prohibits the concurrent representation of clients without informed written consent only if the attorney represents one of the clients in a matter in which the clients' interests are adverse; it does not prohibit the concurrent representation of clients whose interests are adverse only in a matter in which the attorney does not represent either client.[5]

---

[5] As amicus curiae Los Angeles County Bar Association points out, to regard an attorney's concurrent representation of clients whose interests are not adverse in any of the matters in which the attorney represents those clients as a conflict of interest due to the clients' adversity in a third matter in which the attorney does not represent either client would impose a

■ MLB's concurrent representation of Indemnity in the *Seyfarth* action and Fremont General in the *Gularte* action is not a proper basis for disqualification under rule 3-310(C)(3) because the clients' interests in those matters were not adverse. The fact that the clients' interests were adverse in a third matter, the NOL dispute, in which MLB did not represent either client does not implicate the duty of loyalty or justify disqualification. Moreover, despite the statements in the challenged orders that "MLB have not shown when they were initially consulted regarding the representation of Fremont General in matters adverse to the Insurance Commissioner" and "MLB still have refused to reveal how and when they were initially consulted regarding representation of Fremont General in matters adverse to the Insurance Commissioner," there is no evidence that Fremont General or Insurance Group consulted with MLB in connection with the NOL dispute before June 2004, and the uncontroverted declarations discussed *ante* show that defendants first consulted with MLB in connection with the NOL dispute in June 2004. We therefore conclude that disqualification of counsel based on the concurrent representation of parties with conflicting interests is not warranted.

### 4. Disqualification Is Not Justified Based on the Prior Representation of a Party in a Substantially Unrelated Matter

■ An attorney's representation of a client in a matter against a former client implicates the duty of confidentiality. "Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring ' "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." [Citation.]' [Citation.] To this end, a basic obligation of every attorney is '[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client.' (Bus. & Prof. Code, § 6068, subd. (e).)" (*SpeeDee, supra,* 20 Cal.4th at p. 1146.)

■ Rule 3-310(E) prohibits the successive representation of clients in certain circumstances without the informed written consent of the client and former client. The rule states: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client

---

tremendous burden on attorneys to discover all matters in which a client's interests might conflict with those of another client and could result in much more frequent disqualification of counsel.

or former client, the member has obtained confidential information material to the employment." (Rule 3-310(E).) If there is a substantial relationship between the subject of the current representation and the subject of the former representation, the attorney's access to privileged and confidential information in the former representation is presumed and disqualification of the attorney from the current representation is mandatory in order to preserve the former client's confidences. (*SpeeDee, supra,* 20 Cal.4th at p. 1146; *Flatt v. Superior Court, supra,* 9 Cal.4th at p. 283; *H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1452 [280 Cal.Rptr. 614].)

The subject of a current representation is substantially related to the subject of a prior representation only if the issues are sufficiently similar to support a reasonable inference that the attorney in the course of the prior representation was likely to have obtained confidential information material to the current representation. (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847 [43 Cal.Rptr.3d 771, 135 P.3d 20]; *Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 679–680 [14 Cal.Rptr.3d 618]; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 711 [7 Cal.Rptr.3d 868].) A presumption that an attorney possesses confidential information ordinarily is imputed to the attorney's entire firm "on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients'[,] confidential information.' (*SpeeDee, supra,* 20 Cal.4th at pp. 1153–1154, fn. omitted.)" (*Cobra Solutions, supra,* at p. 848.)

 Indemnity cites *Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 709 [3 Cal.Rptr.3d 877] for the proposition that an attorney's direct and personal relationship with a former client can establish a "substantial relationship" so as to justify disqualification even if there is no similarity between the issues involved in the current representation and those involved in the former representation. *Jessen* does not support that proposition. *Jessen* stated: "[W]hether an attorney should be disqualified in a successive representation case turns on two variables: (1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." (*Id.* at p. 709.) *Jessen* stated that if an attorney was personally involved in providing legal advice and services to a former client, the attorney is presumed to possess confidential information and "disqualification will depend upon the strength of the similarities between the

legal problem involved in the former representation and the legal problem involved in the current representation." (*Ibid.*) *Jessen* stated further that if "the former attorney-client relationship [was] peripheral or attenuated instead of direct," the attorney is not presumed to possess confidential information absent "an adequate showing that the attorney was in a position vis-à-vis the client to likely have acquired confidential information material to the current representation."[6] (*Jessen*, at p. 710.) *Jessen* held "successive representations will be 'substantially related' when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues. [Citations.]" (*Id.* at p. 713.)

*Jessen v. Hartford Casualty Ins. Co.*, *supra*, 111 Cal.App.4th 698 did not dispense with the requirement that the issues involved in the current and prior representations must be sufficiently similar to support a reasonable inference that the attorney obtained confidential information material to the current representation. Rather, the language cited by Indemnity concerning "two variables" (*id.* at p. 709) underscores that even if the issues are similar, there must be some basis to conclude that an attorney who had no direct, personal involvement in the prior representation was privy to confidential information. As the court that decided *Jessen* later explained: "*Jessen* does not focus solely upon the nature and extent of the attorney's involvement in the compared representations by detaching from the necessary analysis the factual and legal issues involved in the representations. To the contrary, when the attorney's contact with the client in the first representation was direct, the *Jessen* evaluation of whether the two representations are substantially related centers precisely upon the factual and legal similarities of the two representa-tions. (*Jessen*, *supra*, 111 Cal.App.4th at pp. 709–710.) When the attorney's contact with the client in the first representation was not direct, the *Jessen* evaluation of whether the two representations are substantially related in-volves consideration of the factual and legal similarities of the representations as well as the nature of the attorney's past relationship with the former client. (*Id.* at pp. 710–711, *Ahmanson*, *supra*, 229 Cal.App.3d at p. 1454; Rest.3d., Law Governing Lawyers, § 132, com. h.; see Wolfram, *Former Client*

---

[6] A common example of circumstances that would justify disqualification of an attorney despite the absence of direct, personal involvement by the attorney in the prior representation is where another attorney in the same law firm had a direct professional relationship with the former client in the prior representation. (See *City and County of San Francisco v. Cobra Solutions*, *supra*, 38 Cal.4th at p. 847 [citing *Jessen v. Hartford Casualty Ins. Co.*, *supra*, 111 Cal.App.4th 698 in the context of a discussion of vicarious disqualification].)

*Conflicts*, (1998) 10 Geo. J. Legal Ethics 677, 733–735 [peripheral representation] (Wolfram).)" (*Farris v. Fireman's Fund Ins. Co.*, *supra*, 119 Cal.App.4th at pp. 679–680.)

"Second, *Jessen* did not adopt the so-called playbook approach. (See Rest.3d., Law Governing Lawyers, § 132, com. d (iii), pp. 379–380; Wolfram, *supra*, at p. 723[.]) To create a conflict requiring disqualification, *Jessen* mandates that the information acquired during the first representation be 'material' to the second; that is, it must be found to be directly at issue in, or have some critical importance to, the second representation. (*Jessen*, *supra*, 111 Cal.App.4th at pp. 712–713; Wolfram, *supra*, at p. 724 [only 'when such information will be directly in issue or of unusual value in the subsequent matter will it be independently relevant in assessing a substantial relationship'].) Thus, for example, the attorney's acquisition during the first representation of general information about the first client's 'overall structure and practices' would not of itself require disqualification unless it were found to be 'material'—i.e., directly in issue or of critical importance—in the second representation. (See *SLC Ltd. v. Bradford Group West* (10th Cir.1993) 999 F.2d 464, 467–468 [financial information].) The same is true about information such as the first client's 'litigation philosophy' or 'key decision makers.' Our reference to these and other factors in *Jessen* did not establish any one of them, singly or in any particular combination, as a litmus test; we simply identified some of the categories of information that might be found to be 'material' and therefore relevant to a determination whether the attorney ought to be disqualified." (*Farris v. Fireman's Fund Ins. Co.*, *supra*, 119 Cal.App.4th at p. 680.)

The *Seyfarth* action was a legal malpractice action arising from circumstances and involving issues totally unrelated to the NOL dispute. Indemnity does not argue otherwise. Because the issues are totally unrelated, Indemnity has not established a reasonable probability that MLB through its contacts with LeVine, as counsel for the commissioner acting on behalf of Indemnity in liquidation, obtained confidential information material to the present actions. In particular, Indemnity has not shown that purported information concerning "the Commissioner's litigation philosophy and practices" is material to any issue in these actions. Indemnity also presented no evidence that MLB obtained confidential information material to these actions through contacts with Indemnity's officer's and employees in prior representations.

We therefore conclude that disqualification based on the prior representation of a party in a substantially related matter is not warranted. The record before us establishes that the required substantial relationship simply was not present.

## *DISPOSITION*

The orders of January 25, 2005, and April 22, 2005, disqualifying MLB as counsel for Fremont General and Insurance Group in the NOL action and the Comstock action are reversed. Fremont General and Insurance Group are entitled to recover their costs on appeal.

Kitching, J., and Aldrich, J., concurred.