[No. G044223. Fourth Dist., Div. Three. Mar. 22, 2011.]

BANNING RANCH CONSERVANCY, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
CITY OF NEWPORT BEACH et al., Real Parties in Interest.

## COUNSEL

Shute, Mihaly & Weinberger, Andrew W. Schwartz, Robert S. Perlmutter, Deborah L. Miller and Erin B. Chalmers for Petitioner.

No appearance for Respondent.

David R. Hunt, City Attorney, and Kyle E. Rowen, Deputy City Attorney, for Real Parties in Interest.

## Opinion

**THE COURT.**[*]—Litigants have a right to be represented by counsel of their choice, particularly in substantive areas requiring particular expertise. In short, they have the right to hire the best professionals for their team. But they cannot induce their adversary's attorney to switch sides midstream. There is a rule of automatic disqualification where counsel breaches the duty of loyalty by simultaneously representing two current clients with adverse interests.

What does it mean to be a current client? This may not be as obvious as it seems. More than five years ago, petitioner's counsel prepared two identically worded fee agreements with real party in interest for a specific matter, which closed shortly thereafter after minimal legal work. However, the retainer agreements were open-ended, affording counsel and real party in interest the option of creating future engagements without new writings. Counsel never again represented real party in interest. Do these "framework" retainer agreements of themselves create a *current* attorney-client relationship between counsel and real party in interest?

We conclude the answer is no. Framework retainer agreements are not the same as "classic" retainer agreements, where the client pays a fee to secure the attorney's future time and availability, and where the attorney gives up the right to decline future legal work. We issue a peremptory writ in the first instance to remedy the trial court's error in disqualifying petitioner's counsel based on a nonexistent conflict of interest.

I

### Procedural History

Petitioner Banning Ranch Conservancy (Conservancy) is a nonprofit public benefit corporation under 26 United States Code section 501(c)(3), dedicated to preserving Banning Ranch, a 400-acre coastal property, as open space. The Conservancy has objected to plans by real party in interest City of Newport Beach (City) to build a four-lane divided highway on this land, and critically commented about adverse impacts during the environmental review process under the California Environmental Quality Act. (CEQA; Pub. Resources Code, § 21000 et seq.)

---

[*]Bedsworth, Acting P. J., Fybel, J., and Ikola, J.

In April 2010, the Conservancy, represented by the law firm of Shute, Mihaly & Weinberger (the Shute firm), filed the underlying CEQA litigation to challenge the project approval because of the allegedly flawed EIR (environmental impact report).

In August 2010, the City filed a motion to disqualify the Shute firm based on alleged conflicts of interest. The City had two different theories: First, the City claimed to be the firm's *former* client on at least eight different matters, all of which were closed some five to 10 years ago. Second, the City claimed to be the Shute firm's *current* client based on two identically worded letter agreements, drafted and signed in 2005. The 2005 agreements are each entitled "Legal Retainer Agreement, Public Trust Matters."[1]

The 2005 agreements provide that the Shute firm would provide legal services to the City, on an "as-requested" basis, in connection with "public trust matters of concern to [the City]." The agreements, however, conditioned such representation on the Shute firm's confirmation of its "ability to take on the matter." If such representation was requested and accepted, the agreed-upon rates were to be $250 per hour for partners and $215 per hour for associates. The City's supporting declarations showed the 2005 agreements never had been terminated.

In opposing the disqualification motion, the Shute firm declared that it prepared the 2005 agreements in conjunction with the City's request for representation regarding proposed mooring permit regulations. The Shute firm performed a total of 1.2 hours of work on this matter, and sent the City its final invoice in July 2005. The Shute firm continued doing some minor legal work on another matter, but that matter concluded in early 2006. Other than the initial matter concerning mooring permit regulations, the City never requested that the Shute firm undertake any other legal work pursuant to the 2005 letter agreements.

No attorney from the Shute firm has since communicated with any of the City's attorneys, staff, or council members regarding any legal matter other than in conjunction with the underlying lawsuit. By contrast, the City since has hired at least 10 different law firms other than the Shute firm to represent it on CEQA matters since 2006.

---

[1] Attorney William White, a partner at the Shute firm, explained why there were two identical agreements. He prepared an agreement, dated April 27, 2005, when he was doing some legal work for the City on mooring permits. He thought there was an earlier agreement, but neither he nor the City could find it. The earlier agreement, dated January 24, 2005, was eventually discovered, but there is no difference between the two.

Attorney Amy Bricker, who was assigned by the Shute firm to work on the underlying suit, declared she performed a conflicts check before agreeing to represent the Conservancy, and spoke extensively with the two partners at the Shute firm who were most familiar with its prior work with the City. She confirmed that "none of the prior matters bore any substantial relationship to the [instant] litigation." For example, the John Wayne Airport litigation involved airport noise. The Balboa Village Improvement Project, which ended in 2004, involved a challenge to a project by an arbor society seeking to protect certain ficus trees. The Shute firm declared there were no substantial relationships between any of the prior matters and its current work for the Conservancy.

On September 9, 2010, the trial court held a hearing on the City's motion. The court granted the motion to disqualify, determining that the City remained the Shute firm's current client. "The Court finds that [the Shute firm] is also counsel for [the] City pursuant to the terms of two ongoing retainer agreements. . . . Both agreements are executed by [the Shute firm] and [the City]. . . . [The Shute firm] provides no evidence that either of the retainer agreements was terminated, and the agreements do not provide that it would expire under their own terms."

The trial court recognized that the matter was not a "slam dunk." "Obviously there are important interests—very important interests on both sides, which the court has given due consideration to, and has balanced." The court filed its disqualification order on October 5, 2010.

The Conservancy filed a writ petition, including a request for a peremptory writ in the first instance. (Code Civ. Proc., § 1088; *Lewis v. Superior Court* (1999) 19 Cal.4th 1232 [82 Cal.Rptr.2d 85, 970 P.2d 872] (*Lewis*).) The City filed an opposition, and the Conservancy filed a reply. We granted a temporary stay of the disqualification order pending consideration of the writ petition.

II

STANDARD OF REVIEW

We review the trial court's disqualification order for abuse of discretion. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).) We do not substitute our judgment about disputed factual issues, where supported by substantial evidence. However, where the material

facts are not in dispute, we independently review the disqualification ruling as a question of law, and will reverse where taken without a reasonable basis. (*Ibid.*; see also *Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 728 [135 Cal.Rptr.2d 415].)

■ Disqualification motions implicate competing considerations. On the one hand, these include clients' rights to be represented by their preferred counsel and deterring costly and time-consuming gamesmanship by the other side. "[T]he client has an interest in competent representation by an attorney of his or her choice [citations] and perhaps, the interest in avoiding inconvenience and duplicative expense in replacing counsel already thoroughly familiar with the case. [Citations.]" (*Lyle v. Superior Court* (1981) 122 Cal.App.3d 470, 481 [175 Cal.Rptr. 918].)

Balanced against these are attorneys' duties of loyalty and confidentiality and maintaining public confidence in the integrity of the legal process. "The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1145.) "The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another." (*Id.* at p. 1147.)

■ There are different disqualification standards for attorneys who have conflicts with former clients and those who have conflicts with current clients. As to conflicts involving successive representation with former clients, courts look to whether there is a "substantial relationship" between the subjects of the current and the earlier proceedings. (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 847 [43 Cal.Rptr.3d 771, 135 P.3d 20]; *Fremont Indemnity Co. v. Fremont General Corp.* (2006) 143 Cal.App.4th 50, 67 [49 Cal.Rptr.3d 82] (*Fremont*).)

In contrast, there is a more stringent standard when an attorney simultaneously represents two current clients with conflicting interests. Disqualification, as the parties agree, is *mandatory* in such circumstances even though the simultaneous matters may have nothing in common. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*).) " 'Something seems radically out of place if a lawyer sues one of the lawyer's own present clients in behalf of another client. Even if the representations have nothing to do with each other, so that no confidential information is apparently jeopardized, the client who is sued can obviously claim that the lawyer's sense of loyalty is askew.' " (*Id.* at p. 285, italics omitted; see Rules Prof. Conduct, rule 3-310(C) [attorney may not "[r]epresent a client in a

matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter"].)

We separately analyze each scenario, and conclude the trial court abused its discretion in disqualifying the Shute firm from representing the Conservancy.

III

SIMULTANEOUS (CURRENT) REPRESENTATION OF ADVERSE CLIENTS

■ The prohibition against simultaneous representations of adverse clients has been analogized to the biblical injunction against serving two masters. (*Flatt, supra,* 9 Cal.4th at p. 286.) Until litigation comes to an end, clients rightfully rely upon their attorneys' " ' "undivided allegiance and faithful, devoted service." ' " (*Id.* at p. 287.) The rule is designed to preclude attorneys from being placed in the position of choosing between conflicting duties, or reconciling conflicting interests. (*Id.* at pp. 288–289; *In re Charlisse C.* (2008) 45 Cal.4th 145, 160 [84 Cal.Rptr.3d 597, 194 P.3d 330].)

There is no evidence from which a current attorney-client relationship can be inferred or implied from a course of dealings between the Shute firm and the City. (See *Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1732 [20 Cal.Rptr.2d 756]; Civ. Code, § 1621.) The City does not claim that it is being currently represented by the Shute firm on any outstanding matter. Indeed, the underlying facts establish, without dispute, that the Shute firm has not represented the City on any specific matter since 2006, and has not since communicated with the Shute firm on any legal issue.

Instead, the City contends, and the trial court agreed, the simultaneous representation arises because of the express provisions of the 2005 agreements alone. According to the City, the "two Legal Retainer Agreements between the City and Shute Mihaly are best described as on-going, prospective legal retainer agreements."

As we explain, none of the language in the 2005 agreements is reasonably susceptible to the suggested interpretation that the City remains a current client of the Shute firm. Instead, the "as-requested" and "to be confirmed" provisions of the 2005 agreements require that the parties agree to new attorney-client relationships on a matter-by-matter basis.

A. *Contractual Language and Interpretation*

■ Retainer agreements are enforced like any other contract if they are certain and unambiguous. (See *Preston v. Herminghaus* (1930) 211 Cal. 1, 9

[292 P. 953] (*Preston*).) We therefore apply ordinary principles of contract interpretation to the 2005 agreements.

"The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.' " (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [135 Cal.Rptr.2d 505] (*Founding Members*).) "The language of [the] contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.) Any ambiguity in a retainer agreement is construed in favor of the client and against the attorney. (*Preston, supra*, 211 Cal. at p. 9.)

We turn to the language of the 2005 agreements. The 2005 agreements are so-called "framework" retainer agreements, providing a structure for establishing future attorney-client relationships on an "as-requested" basis by the City, and subject to confirmation by the Shute firm, depending upon such considerations as conflicts checks, caseload and workflow situations. We concur with the Conservancy's characterization of these agreements as providing a "general framework . . . under which potential future representation could occur should the City request and [the Shute firm] accept, work on any particular matter." As the Conservancy explains, the 2005 agreements were designed to expedite the Shute firm's future relationships with the City, but "did not create an attorney-client relationship absent an actual request, and acceptance, for representation on a particular matter."

Section 1 ("Legal Services to be Provided") contains the "as-requested" language. It states, "The Firm is retained to provide assistance to Client on *public trust matters* on an *as-requested basis*. The firm is not being retained to provide litigation services." (Italics added.)

Section 3 ("Particular Matters / Conflict of Interest") holds the most critical language. It gives the Shute firm the contractual right to "confirm the Firm's ability to take on" any "particular matter," based on such factors as the firm's workload and its conflicts checks. Section 3 states, "As you and I have discussed, it is possible that this Firm will be unable to advise Client with respect to a particular matter due to a potential or actual conflict of interest, workload considerations, or other reason. Accordingly, *in each case*, before we can advise Client with respect to a particular matter, we will need to

perform a 'conflict check' and otherwise *confirm* the Firm's ability to take on the matter. If the Firm cannot advise Client with respect to a particular matter, we will promptly notify Client." (Italics added.) There is no evidence that the Shute firm ever represented the City on any matter other than as described in this opinion.

These clearly stated qualifiers in the 2005 agreements belie the City's contention that the agreements created an ongoing, open-ended attorney-client relationship. They instead contain two prerequisites for any future representation: first, the City must *request* that the Shute firm represent it on a particular matter, and second, and equally important, the Shute firm must *confirm* the request. Once both conditions were satisfied, the 2005 agreements governed the general terms, hourly rates and billing practices for any such future representation, without the necessity of a new writing.

The City argues that the Shute firm, which drafted the 2005 agreements, could have more explicitly provided that the City was not the firm's current client, unless the Shute firm was affirmatively working on an open matter for the City. The City argues: "The very terms of the Legal Retainer Agreements do not state that the City is not to be considered a client unless Shute Mihaly is affirmatively working on a matter for the City."

■ The 2005 agreements unambiguously call for representation on a matter-by-matter basis. The language of the 2005 agreements is not reasonably susceptible to the construction that the Shute firm currently represents the City. The fact that an agreement could have been made even clearer does not render the existing terms ambiguous. (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [46 Cal.Rptr.3d 668, 139 P.3d 56] [" 'There cannot be an ambiguity per se, i.e. an ambiguity unrelated to an application.' "].) Nor is an agreement ambiguous "merely because the parties (or judges) disagree about its meaning. Taken in context, words still matter." (*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356 [116 Cal.Rptr.3d 860].)

B.  *Extrinsic Evidence*

■ Next, we examine the extrinsic evidence offered to construe the 2005 agreements. "Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. [Citations.] If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract. [Citations.] Thus, '[t]he test of admissibility of

extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' [Citation.] [¶] The threshold issue of whether to admit the extrinsic evidence—that is, whether the contract is reasonably susceptible to the interpretation urged—is a question of law subject to de novo review. [Citations.]" (*Founding Members, supra*, 109 Cal.App.4th at p. 955.)

If no extrinsic evidence is introduced or admissible, or if the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract from the writing alone. (*Founding Members, supra*, 109 Cal.App.4th at pp. 955–956.)

■ The City has not cited any extrinsic evidence to show the 2005 agreements were reasonably susceptible of a different interpretation as an expression of the parties' mutual intent at the time of contracting. The extrinsic evidence showed the Shute firm drafted the 2005 agreements in response to a request by the City to perform work regarding a specific matter involving the City's mooring permit regulations. To support the disqualification motion, Dave Kiff, the city manager, declared, "Based upon the Legal Retainer Agreements dated January 24, 2005 and April 27, 2005 respectively, I consider the City to still be a valued client of Shute Mihaly's." However, under the objective theory of contracts, a party's undisclosed subjective intent cannot be used to override the contractual terms themselves. (*Founding Members, supra*, 109 Cal.App.4th at p. 956.)

■ In addition, "[a] party's conduct occurring between [the] execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393 [75 Cal.Rptr.3d 333, 181 P.3d 142].) After the 2005 agreements were executed, the Shute firm performed a total of 1.2 hours of work on the mooring permit, and never performed any other legal services for the City pursuant to the agreements. The City instead retained at least 10 other law firms to represent it on environmental and land use matters that arose in the ensuing years. This conduct supports the conclusion the 2005 agreements called for representation on a matter-by-matter basis.

The competent extrinsic evidence therefore does not support the City's construction of the 2005 agreements. Accordingly, we construe the 2005

agreements independently based on the contractual language. (*Founding Members, supra,* 109 Cal.App.4th at pp. 955–956.)

## C. Termination or Withdrawal from the 2005 Agreements

The City stresses that neither the Shute firm nor the City has acted to terminate or withdraw from the 2005 agreements, leaving them "still in force and effect to this very day." The City argues "[a]s neither the City [n]or Shute Mihaly have terminated the two Legal Retainer Agreements, the Superior Court was correct in concluding that the City is a current client of Shute Mihaly and properly granted the Motion." The trial court was concerned that the Shute firm's interpretation would render the withdrawal and termination provisions "superfluous." The court stated: "The references to the procedures would be superfluous . . . if the agreement simply expired after a certain amount of time had lapsed after the City had asked the [Shute] firm to work on a matter pursuant to the retainer."

■ We cannot agree with these arguments. Section 5 of the 2005 agreements (the pertinent section on withdrawal) speaks to the Shute firm's withdrawal from currently pending matters. That is why the operative language in section 5 permits withdrawal only "as permitted under the Rules of Professional Conduct." Under California law, continuity of representation does not depend upon a formal withdrawal or the client's subjective beliefs so much as "on evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship." (*Worthington v. Rusconi* (1994) 29 Cal.App.4th 1488, 1498 [35 Cal.Rptr.2d 169].) ■ There is no need to "terminate" the 2005 agreements because the framework they establish is not self-effectuating. Instead, future representation on particular matters requires reciprocating actions by both client and attorney, "as-requested" by the City and "as confirmed" by the Shute firm.

These triggering events have not occurred for some six years. As a result, the Shute firm is not the City's current client, even though the 2005 agreements have not been formally terminated and remain in effect with the framework still existing for future representation.

## D. Classic Retainer Agreements Distinguished

■ The trial court erroneously equated these framework retainer agreements with "classic" retainer agreements. The latter type of retainer agreements (which also may be called "general" or "true" retainer agreements) involve clients who pay an engagement retainer fee to secure ongoing legal

representation for a specified period of time. (See *Baranowski v. State Bar* (1979) 24 Cal.3d 153, 164, fn. 4 [154 Cal.Rptr. 752, 593 P.2d 613] [a "classic 'retainer fee' arrangement" is one in which "a sum of money [is] paid by a client to secure an attorney's availability over a given period of time"]; Rules Prof. Conduct, rule 3-700(D)(2) [ethical rule requiring return of unearned fees upon termination does not apply to "a true retainer fee which is paid solely for the purpose of ensuring the availability of the member for the matter"].)

Classic retainer agreements, in essence, are option agreements: in exchange for the payment of an engagement retainer fee, the attorneys commit themselves to take on future legal work, regardless of inconvenience, client relations or workload constraints. "[L]awyers make two present sacrifices at the time of signing a general retainer agreement: they reallocate their time so that they can stand ready to serve the general retainer client to the exclusion of other clients and they give up their right to be hired by persons with interests that conflict with the general retainer client, thus again foregoing potential income." (Brickman & Cunningham, *Nonrefundable Retainers Revisited* (1993) 72 N.C. L.Rev. 1, 9; see also Richmond, *Understanding Retainers and Flat Fees* (2009) 34 J. Legal Prof. 113.)

No such commitments are contained in the 2005 agreements. The Shute firm did not receive any engagement retainer fee, and the Shute firm made no commitments for future legal representation. To the contrary, in section 3, the Shute firm said only that it would have to "confirm the Firm's ability to take on the matter." The 2005 agreements are not classic retainer agreements, and do not create a contractual ongoing attorney-client relationship in the absence of a specific request by the City and an equally specific acceptance by the Shute firm.

## IV

### SUCCESSIVE (PRIOR) REPRESENTATION OF ADVERSE CLIENTS

The trial court did not disqualify the Shute firm from representing the Conservancy based on its past representation of the City in other matters. Although the City raised the subject below, its opposition to the writ petition does not mention the topic.

The City's reticence is well founded. Although the Shute firm previously represented the City on numerous legal matters (primarily relating to issues concerning the John Wayne Airport and the adaptive reuse of the former El Toro Marine Corps Air Station), none of these cases bore any substantial relation to the current litigation brought by the Conservancy against the City.

■ Under California law, a law firm is subject to disqualification based upon its prior representation under the following circumstances: "If there is a substantial relationship between the subject of the current representation and the subject of the former representation, the attorney's access to privileged and confidential information in the former representation is presumed and disqualification of the attorney from the current representation is mandatory in order to preserve the former client's confidences." (*Fremont, supra*, 143 Cal.App.4th at p. 67.)

The City cites the Shute firm's "national recognition as a leading environmental and land use law firm . . . ," and the "special insight" the firm's attorneys have gained into the City's approach to land use matters through its prior representation of the City in past decades. According to the city manager, "the City's approach to CEQA, the CEQA Guidelines and the California Coastal Act was created in part based upon the advice and counsel the City received from Shute Mihaly in the form of confidential documents protected by the attorney-client privilege."

■ Merely knowing of a former client's general business practices or litigation philosophy is an insufficient basis for disqualification based upon prior representation. In *Fremont, supra*, 143 Cal.App.4th 50, the Court of Appeal reversed a disqualification order where the law firm's former representation was unrelated to the current dispute, and where there was no reason to believe the firm acquired material confidential information during the course of the prior representation. Because the record did not support a substantial relationship sufficient to give rise to an inference that the firm acquired material confidential information, the *Fremont* court found an abuse of discretion.

As *Fremont* and other cases hold, former representation alone does not give rise to a lifetime prohibition against future representation of an opposing party. Without evidence of a substantial relationship between the former and present representations, the City has failed to satisfy well-settled requirements. Accordingly, the Conservancy is able to retain its choice of counsel.

V

WHY A PEREMPTORY WRIT SHOULD ISSUE

■ An order disqualifying an attorney is appealable, but is also subject to review by extraordinary writ. (*State Water Resources Control Bd. v. Superior Court* (2002) 97 Cal.App.4th 907, 913 [118 Cal.Rptr.2d 784].) As noted in *Reed v. Superior Court* (2001) 92 Cal.App.4th 448, 455 [111 Cal.Rptr.2d 842], writ petitions may offer a preferable method to review

erroneous disqualification orders "because generally extraordinary writs are determined more speedily than appeals. The specter of disqualification of counsel should not be allowed to hover over the proceedings for an extended period of time for an appeal." (See also *Chambers v. Superior Court* (1981) 121 Cal.App.3d 893 [175 Cal.Rptr. 575] [writ of mandate to vacate unwarranted disqualification order and to enter new order permitting petitioners' law firm to continue to represent petitioners].)

We too have chosen to employ the writ procedure to provide the most expeditious form of relief to the Conservancy. "The right of a party to be represented in litigation by the attorney of his or her choice is a significant right [citation] and ought not to be abrogated in the absence of some indication the integrity of the judicial process will otherwise be injured . . . ." (*Johnson v. Superior Court* (1984) 159 Cal.App.3d 573, 580 [205 Cal.Rptr. 605].) The Conservancy has stressed its limited resources to retain experienced environmental counsel, particularly given the Shute firm's "extremely competitive rates to government entities and non-profit groups. [Citation.] It is unlikely that the group could find new counsel that would match [the Shute firm's] fees. . . . Accordingly securing new counsel to continue on with the case may prove prohibitively expensive for [the Conservancy] and the case therefore may never be heard."

The Conservancy provided a *Palma* notice to the City that it was seeking a peremptory writ in the first instance. (*Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].) Following this notice, the City filed opposition challenging the claim of urgency, among other grounds. The statutory requirements have been met. (Code Civ. Proc., § 1088; see *Lewis, supra,* 19 Cal.4th at p. 1240.)

We issue a peremptory writ in the first instance to resolve this purely legal dispute because of the urgent need for relief and the well-settled governing principles. "The accelerated [peremptory writ] procedure is authorized only 'when such entitlement is conceded or when there has been clear error under well-settled principles of law and undisputed facts—or when there is an unusual urgency requiring acceleration of the normal process.' " (*Lewis, supra,* 19 Cal.4th at p. 1258; accord, *State Water Resources Control Bd. v. Superior Court, supra,* 97 Cal.App.4th 907 [peremptory writ in the first instance issued following disqualification order].)

VI

DISPOSITION

Let a peremptory writ of mandate issue directing the Superior Court of Orange County to set aside its order of October 5, 2010, disqualifying the law

firm of Shute, Mihaly & Weinberger from representing petitioner in the underlying action and to enter a new order denying the motion to disqualify. Upon finality of this decision, the temporary stay order shall be dissolved. Petitioner shall recover its costs in this writ proceeding.