Filed 9/29/16  Blue Haven National Management v. Gordon & Rees CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BLUE HAVEN NATIONAL MANAGEMENT, INC., et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>GORDON & REES, LLP, et al.,<br><br>    Defendants and Appellants. | D062967<br><br><br>(Super. Ct. No. 37-2012-00096122-CU-PN-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Jeffrey B. Barton, Judge.  Affirmed.

Pettit Kohn Ingrassia & Lutz, Douglas A. Pettit, Valerie Garcia Hong and Derek Hecht for Defendants and Appellants.

Panakos Law Center, Stephen L. Gordon; and Robert Tier for Plaintiffs and Respondents.

Defendants Gordon & Rees LLP (G&R), Kevin Alexander, and Eric Volkert appeal from the trial court's order denying their motion to compel arbitration of legal

malpractice and other claims by plaintiffs Blue Haven National Management, Inc. (Blue Haven), Golden State Industries, Inc. (Golden State), P&A Holdings, Inc. (P&A), Robert Namer, and R'Nelle Lahlou, also known as R'Nelle Lazlo (Lazlo), in connection with defendants' representation of plaintiffs in *Katz v. Blue Haven National Management Inc., et al.* (Super. Ct. San Diego County, No. 37-2009-00097863; AAA Case # 73 166 00064 10 DEVI) (*Katz*).[1]  No legal services agreement was prepared for *Katz*.  Rather, defendants rely on an arbitration provision in a legal services agreement with Blue Haven and Golden State in an earlier case, *Davis et al. v. Blue Haven National Management Inc., et al.* (Super. Ct. Los Angeles County, No. BC 380153) (*Davis*).  They contend this agreement applied to their work on *Katz*, including with respect to the nonsignatories (Namer, Lazlo, and P&A).  Plaintiffs contend the agreement did not apply to *Katz* and that, even if it did, the nonsignatories still would not be required to arbitrate.  We conclude the *Davis* agreement does not require any plaintiffs to arbitrate *Katz*-related disputes.  The order is affirmed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Background of the Dispute*

#### 1.  *Davis*

In January 2009 G&R was retained to represent Blue Haven and Golden State in *Davis*, which was filed in the Superior Court of Los Angeles County.  On January 20, 2009, G&R entered into a legal services agreement with Blue Haven and Golden State

---

[1]    Trial court case reference information noted herein is drawn from the parties' briefs and the record.

(*Davis* Agreement).  The agreement defined "Attorney" as G&R and "Clients" as Blue

Haven and Golden State.  Alexander, managing partner of G&R's San Diego office,

signed on behalf of G&R.  Namer signed on behalf of the companies as the executive

vice president of each entity.

Several portions of the *Davis* Agreement are pertinent to the parties' arbitration

dispute.  The scope provisions provide:

> "2.  LEGAL SERVICES TO BE PROVIDED.  The legal services to
> be provided by Attorney to Clients are as follows: advising Clients
> in connection *with the dispute arising from the civil suit entitled*
> *Ronald Davis and Carol Davis, et al v. Blue Haven National*
> *Management, Inc., et al.*, Los Angeles Superior Court Case No.:  BC
> 380153.; and other legal matters upon request by Clients and written
> acknowledgement by Attorney to perform such other services.

> "3.  LEGAL SERVICES SPECIFICALLY EXCLUDED.  If Clients
> desire Attorney to provide any legal services not to be provided
> under this Agreement, a separate agreement between Attorney and
> Clients will be required."

Alexander addressed these provisions in a declaration supporting the motion to

compel.[2]  Discussing paragraph 2, Alexander stated G&R intended the *Davis* Agreement

to apply to " 'other legal matters' requested by Blue Haven, [Golden State], or Namer as

recurring clients for future matters that G&R acknowledged . . . in writing."  He

explained paragraph 3 "required that the parties would prepare a different agreement if

the parties did not want the LSA to apply."  At his deposition, Alexander elaborated that

---

[2]     Unless otherwise noted, G&R partners discussed herein provided statements in
declarations filed in support of the motion to compel.

3

the intent of paragraph 2 was to "provide an easier mechanism so that we don't have to reinvent the wheel every time a new matter comes in . . . . "

Another provision, paragraph 4, addresses the parties' responsibilities. G&R agreed to "perform the legal services called for under this Agreement, keep Clients informed of progress and developments, and respond promptly to Clients' inquiries and communications." Blue Haven and Golden State agreed to "cooperate with Attorney, attend all meetings, arbitrations, mediations or court events as requested, provide necessary declarations, promptly pay all fees and costs, and keep [Attorney] informed of Clients' whereabouts."

Finally, the malpractice arbitration provision, paragraph 17, stated in relevant part: "If a dispute arises between Attorney and Clients (defined as including any agents, employees, officers, representatives or related entities or persons of Clients) as to whether any legal services rendered by Attorney under this agreement or otherwise, were improperly, negligently, or incompetently rendered, or otherwise rendered in breach of a contractual or ethical duty, the dispute will be submitted for arbitration, and Attorney and Clients will be bound by the result. [¶] . . . [¶] . . . Attorney and Clients agree that this Attorney's law office in San Diego, California shall be a proper venue for any legal proceedings hereunder."

2. *Seyfferth*

In or around February 2009, Blue Haven and Diving Lady Pools of Arizona, Inc., were sued in Arizona in *Robert Seyfferth Company, Inc., et al. v. Diving Lady Pools of Arizona, Inc, et al.* (Super. Ct. Maricopa County, No. CV 2009-090480) (*Seyfferth*).

4

According to G&R partner David O'Daniel, Namer requested G&R provide representation and G&R agreed to do so. O'Daniel stated G&R "engaged in many communications, including but not limited to written correspondence[], billing invoices, and verbal discussions, with Mr. Namer confirming acknowledgment of representation," but the record contains none of the letters or invoices. O'Daniel indicated he was informed and believed Blue Haven was an existing client when he began representing it. He also believed a "written agreement existed concerning . . . legal services by . . . G&R for a lawsuit involving [Blue Haven] and [Golden State] and their 'other legal matters.' " O'Daniel indicated no written agreement was requested for *Seyfferth*. The record contains an unsigned legal services agreement for *Seyfferth* (*Seyfferth* Agreement), but O'Daniel did not address it.[3]

3. *Zamel*

In or around April 2009, all of the plaintiffs were sued in California in *Zamel Enterprises LP v. Eisman et al.* (Super. Ct. San Diego County, No. 37-2009-00088045-CU-BT-CTL) (*Zamel*). As with *Seyfferth*, a G&R attorney (here, Alexander) indicated Namer requested representation, G&R agreed to provide it, and there were written communications and invoices (which, again, are not in the record). G&R partner Marshall Brenner provided input on *Zamel*. He believed Blue Haven and Golden State

---

3      According to plaintiffs' opposition brief in the trial court, defendants "emailed [an] LSA [legal services agreement] (hereinafter 'Seyfferth LSA') to Blue Haven that specified the legal services to be provided. (Declaration of Aaron Sadock . . . , Exhibit A.)" However, Sadock's declaration attached only the agreement, not the e-mail, and did not address the preparation of the agreement or why it remained unsigned.

5

were existing clients and a written legal services agreement was in place. Brenner prepared a letter acknowledging the representation and seeking a conflict waiver, which he indicated plaintiffs provided. The letter is not in the record. Brenner indicated plaintiffs did not request a new legal services agreement for *Zamel*.

4. *TMC*

In or around May 2009, Golden State was sued in Arizona in *TMC Pool Care & Repair LLC v. Golden State Industries, Inc.* (Super. Ct. Maricopa County, No. CV 2009-091543) (*TMC*). Namer requested that G&R provided representation. G&R entered a legal services agreement with Golden State (*TMC* Agreement). Namer signed on behalf of Golden State, but the page with G&R's signature is omitted from the record. The *TMC* Agreement contains similar scope provisions to the *Davis* Agreement.[4] The agreement also contains an arbitration provision, but it differs from the one in the *Davis* Agreement (including by requiring arbitration to take place in Arizona).

---

[4] The *TMC* scope provisions are as follows: "2. LEGAL SERVICES TO BE PROVIDED. The legal services to be provided by Attorney to Client are as follows: advising and defending Client in connection *with the dispute arising from the civil suit entitled* [*TMC*] *v*. [*Golden State*] . . . , and other legal matters upon request by Client and written acknowledgment by Attorney to perform such other services. [¶] 3. LEGAL SERVICES SPECIFICALLY EXCLUDED. If Client desires Attorney to provide any legal services not to be provided under this Agreement, a separate agreement between Attorney and Client will be required."

5. *Katz*

On September 4, 2009, plaintiffs were sued in California in *Katz*, along with two additional parties, Alvin G. Eisman and BRP, Inc.[5] Plaintiffs were served on September 9. On September 10, Namer sent the *Katz* complaint to Alexander by e-mail. According to Alexander, Namer requested that G&R provide representation and Alexander advised him to contact his insurance carrier to seek approval of G&R. On September 15, the carrier e-mailed Alexander (copying Namer), identifying P&A as the insured party, indicating Namer consented to the carrier sending a copy of the *Katz* complaint, and asking Alexander to advise whether G&R could represent P&A. On September 22, Alexander sent the carrier and Namer a letter referencing *Katz* and stating, "Thank you for engaging [G&R] in connection with the above matter." Plaintiffs did not request a new legal services agreement for *Katz*.

On June 18, 2010, Alexander sent Eisman, Namer, and Lazlo a letter, stating in part: "Dear Al, Robert, and R'Nelle: [¶] We are pleased to have the opportunity to defend you and [Blue Haven], [Golden State], [and P&A] . . . in the [*Katz*] matter. . . . [¶] The purpose of this letter is to seek your written approval of our joint representation and waiver of any actual or potential conflict of interest." Lazlo signed the waiver letter for herself, while Namer signed on behalf of himself and (it appears) the corporate entities. Alexander indicated Namer represented to him that he was executive vice president and director of Blue Haven, Golden State, and P&A, while Lazlo represented she was vice

---

5    It appears Eisman and BRP are not parties to the malpractice action here. We omit further discussion of them, unless necessary to provide context.

president and director of Blue Haven.  Alexander stated Namer also advised him that P&A was a related entity of Blue Haven and Golden State.

Neither the September 22 or June 18 letter mentioned the *Davis* Agreement or arbitration under it.  At his deposition, Alexander indicated the June 18 letter was an "example of a written acknowledgement to perform legal services."  His understanding was that the letter, along with "prior confirming written letters," was "[p]art and parcel" of "trigger[ing] Paragraph 2 of the *Davis* Agreement . . . ."  He did not "recall specifically discussing with [Namer and Lazlo] the *Davis* LSA during the *Katz* case."[6]

B.  *Malpractice litigation and motion to compel*

Plaintiffs later sued defendants in connection with their work on *Katz*, for legal malpractice and other claims.  Defendants requested that plaintiffs stipulate to arbitration, based on the *Davis* Agreement.  Plaintiffs rejected the request.  Defendants then filed a motion to compel arbitration, which plaintiffs opposed.

The trial court denied the motion.  The court explained defendants had the burden to show plaintiffs entered a valid written arbitration agreement and their reliance on the *Davis* Agreement was "unavailing."  First, the court noted the agreement was entered into "almost nine months prior" to *Katz*.  Second, the court found the agreement ambiguous.  It explained:  "Paragraph 2 suggests that if other legal matters other than *Davis* are worked on, there must be a written acknowledgment by the attorney to provide the additional services.  One could presume that the legal matters performed upon request by

---

6    Neither party addresses Volkert's role here.  From the first amended complaint, it appears he was a G&R partner and lead counsel in *Katz*.

8

the clients would be somewhat related to the *Davis* case, rather than to an unrelated lawsuit. However, paragraph 3 suggests that there must be a separate written agreement if there are other legal services to be performed." The court observed any ambiguity in a retainer agreement is construed against the attorney. It also noted defendants asserted plaintiffs never requested a new agreement, but did not show it was their responsibility to do so. Third, the court focused on the parties' conduct, observing the September 22 and June 18 letters did not mention arbitration as part of the representation (or the *Davis* Agreement) and defendants "had entered . . . intervening retainer agreements . . . ." The court queried how a client would know "which arbitration provision should be the one relied upon . . . ." Finally, the trial court stated, without elaboration, that defendants sought to "hold non-signatories to the arbitration agreement merely because [they] represented these other parties in other cases, or by agency."

The trial court concluded defendants had not met their burden to show a valid arbitration agreement. Defendants timely appealed.

## II. DISCUSSION

### A. *Applicable Law*

#### 1. *Relevant principles regarding enforcement of an arbitration agreement*

"[W]hen presented with a motion to compel arbitration, the court's first task is to determine whether the parties have entered into an agreement to arbitrate their claims. [Citation.] Courts 'apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute.' [Citation.] . . . "The petitioner [seeking arbitration] bears the burden of proving the existence of a valid arbitration

9

agreement by a preponderance of the evidence, while a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense."  (*Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674, 685-686 (*Ramos*).)

In determining the scope of an arbitration clause, " ' "[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation]." ' "  (*Bono v. David* (2007) 147 Cal.App.4th 1055, 1063 (*Bono*).)  "[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested."  (*Ibid.*)  "The burden is on . . . the party opposing arbitration[] to show that the arbitration clause cannot be interpreted to cover the claims . . . ."  (*EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1321 (*Pless*).)

" 'California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration.' "  (*Bono*, *supra*, 147 Cal.App.4th at p. 1062.)  However, " ' " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . .' " ' "  (*Id*. at p. 1063.)

2.  *Relevant principles of contract interpretation*

The "ordinary rules of contract interpretation" are well established.  (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608 (*Santisas*).)   " '[T]he mutual intention of the parties at

the time the contract is formed governs interpretation.  (Civ. Code, § 1636.)[7]  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  (*Id.*, § 1639.)  The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation.  (*Id.*, § 1638.)' "  (*Ibid.*)

" 'A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.  [Citation.]  But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' "  (*Pless*, *supra*, 150 Cal.App.4th at p. 1321.)  " 'A party's conduct occurring between the execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood those terms to mean.' "  (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 915 (*Banning Ranch*).)

"It is a well-settled rule of law that ambiguities in a written contract are to be construed against the party who drafted it."  (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 745 (*Victoria*).)  Further, in the context of legal services, "[a]ny ambiguity in a retainer agreement is construed in favor of the client and against the attorney."  (*Banning Ranch*, *supra*, 193 Cal.App.4th at p. 913; see *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1370 [affirming denial of attorney's motion to compel business dispute

---

7       Subsequent statutory references are to the Civil Code unless otherwise noted.

11

with client; noting "the doctrine of *contra proferentum* (construing ambiguous agreements against the drafter) applies with even greater force when the person who prepared the writing is a lawyer"] (*Mayhew*).)

3. *Standard of review*

The relevant facts are not in dispute. Therefore, this appeal presents questions of law, which we review de novo. (See *Turtle Ridge Media Group, Inc. v. Pacific Bell Directory* (2006) 140 Cal.App.4th 828, 833; *Los Angeles County Metropolitan Transportation Authority v. Shea-Kiewit-Kenny* (1997) 59 Cal.App.4th 676, 682, fn. 2.)

B. *Application*

1. *Applicability of the Davis Agreement to Katz*

As a preliminary matter, we observe there is no genuine dispute as to the existence of an arbitration obligation here, but rather as to its scope. The *Davis* Agreement contains an arbitration provision, and plaintiffs do not contest this provision's existence or validity. Rather, the parties focus on the *Davis* Agreement's scope provisions and whether, under these provisions, the agreement *as a whole* applies to *Katz*. Thus, for purposes of our analysis, we assume defendants established a valid arbitration agreement. (*Ramos*, *supra*, 242 Cal.App.4th at pp. 685-686.)[8] We now address the issue before us: whether that obligation extends to *Katz*.

─────────────

[8]    We recognize the trial court suggested the issue was the existence of an arbitration agreement, not its scope. However, we "review the trial court's ruling, not its rationale." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 80 (*Stewart*).) We also note plaintiffs contend, at the end of their brief, that the *Davis* Agreement is void or voidable due to a purported conflict of interest by G&R in *Katz*. Even if the conflict issue were

12

a. *Language of the Davis Agreement*

In order to discern the parties' intent, we turn first to the agreement's terms. (See *Santisas*, *supra*, 17 Cal.4th at p. 608.) Paragraph 2 includes "other legal matters" as services provided under the agreement, while paragraph 3 states that "[i]f Clients desire Attorney to provide any legal services not to be provided under this Agreement, a separate agreement . . . will be required." Defendants contend a plain reading of these provisions encompasses non-*Davis* work, and suggest they operate together as follows: (1) under paragraph 2, if plaintiffs want G&R to perform non-*Davis* work under the terms of the *Davis* Agreement, they make a request and G&R provides written confirmation; and (2) under paragraph 3, if G&R does not provide confirmation, or plaintiffs want legal services under different terms, a new agreement is required. In contrast, plaintiffs suggest that the way to make paragraphs 2 and 3 consistent is for paragraph 2 to encompass *Davis* advice and, upon request, other *Davis*–related work (e.g., "follow-on matters"), and for paragraph 3 to apply to non–*Davis* work.[9]

Contrary to defendants' position, the scope provisions do not clearly permit non–*Davis* work under the *Davis* Agreement—and, contrary to plaintiffs' view, they do not

---

properly before us (which defendants dispute), we need not reach it, given our conclusion that the *Davis* Agreement does not require arbitration of *Katz*-related disputes.

[9] The parties also disagree about what the agreement covers, prior to any request for additional work. Plaintiffs rely on paragraph 2 to suggest it encompasses only "advising" in *Davis* (in contrast to the "advising and defending" language in *TMC*) and the clients would have to request other *Davis* work. Defendants cite the duties listed in paragraph 4 to show the agreement already covers other *Davis* work, beyond advising. We not need resolve this dispute, as the issue here is non–*Davis* work, but it underscores the agreement's lack of clarity.

13

clearly exclude it. The provisions reasonably permit both interpretations. Because the provisions permit different constructions, we will treat them as ambiguous. (*Pless*, *supra*, 150 Cal.App.4th at p. 1321.) In turn, we must construe the agreement against defendants, as both the drafters and the attorneys here. (*Victoria*, *supra*, 40 Cal.3d at p. 745; *Banning Ranch*, *supra*, 193 Cal.App.4th at p. 913.) We conclude the *Davis* Agreement's scope provisions do not reflect the parties mutually intended the agreement to extend to non–*Davis* work.

Defendants disagree that the scope provisions are ambiguous. They maintain the provisions "provide a framework" for future work, including "matters in addition to . . . *Davis*." But, as discussed above, the agreement does not clearly extend to such matters— and Alexander's explanation about G&R's intent does not bridge the gap. (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579 ["[U]ncommunicated subjective intent is irrelevant."].) Focusing on the trial court's order, defendants also contend the court "ignore[d] that [the paragraphs] operate in conjunction," the court's "interpretation of each paragraph renders the other paragraph superfluous," and the court was speculating in presuming that paragraph 2's "other legal matters" language referred to *Davis*. These concerns are unfounded. First, the court's order reflects it considered both paragraphs together. Second, the court's reading neither results in superfluous language, nor suggests the court was engaged in speculation. Rather, it appears to result in paragraph 2 covering

14

*Davis*–related work and paragraph 3 covering other legal services, which, as discussed *ante*, is a reasonable interpretation.[10]

   b.  *Parties' course of conduct*

We now turn to the parties' course of conduct.  (See *Banning Ranch*, *supra*, 193 Cal.App.4th at p. 915.)  We conclude the ambiguity of the scope provisions is highlighted, not rectified, by the parties' conduct.

Defendants contend the *Katz* events support their position, as plaintiffs purportedly engaged G&R under the terms of the *Davis* Agreement, never objected to or expressed confusion about these terms, and did not request or sign a new agreement. However, the documentation upon which defendants rely (including the September 22 and June 18 letters) does not mention *Davis*, and Alexander did not recall discussing *Davis* with Namer and Lazlo during *Katz*.  Put simply, there is no evidence plaintiffs were even aware that defendants viewed the *Davis* Agreement as applicable to *Katz*, much less that plaintiffs engaged G&R under its terms.  In turn, we ascribe no significance to plaintiffs' failure to object to these terms or request a new agreement to avoid their application.

Defendants also cite *Seyfferth* and *Zamel* as further evidence that plaintiffs understood that the *Davis* Agreement applied to non–*Davis* legal matters.  But this argument fails for the same reasons as defendants' contentions regarding *Katz*:  There is

10     To the extent the court's order can be read as finding the provisions were ambiguous on their face, as defendants suggest, this does not aid defendants.   Even if the court identified a different basis for ambiguity, the result -- construing the agreement against defendants—was correct.  (See *Stewart*, *supra*, 126 Cal.App.4th at p. 80.)

no evidence that documentation in these matters referenced the *Davis* Agreement or that G&R otherwise discussed its application, so there is no relevance to any absence of objections or new agreements. Indeed, the record is devoid of any documentation from *Seyfferth* or *Zamel*, besides the unsigned *Seyfferth* Agreement.

Finally, defendants contend the existence of the *TMC* Agreement does not undermine their reliance on the *Davis* Agreement. We disagree. The *TMC* Agreement scope provisions parallel those in *Davis*, but its arbitration provision differs. As the trial court observed, it is unclear how a client would know which agreement controlled.[11] Defendants suggest the *TMC* Agreement was intended to cover Arizona litigation. However, nothing in the *TMC* Agreement *states* this intent and there is no evidence plaintiffs were aware of it. In addition, defendants offered inconsistent arguments for the other Arizona case, *Seyfferth*. In their opening brief, defendants contend the *Davis* Agreement applied in *Seyfferth* and do not address the unsigned *Seyfferth* Agreement. But on reply, defendants acknowledge the *Seyfferth* Agreement and suggest that, as in *TMC*, the Arizona venue required different terms—without clarifying their earlier position. Defendants also contend we should not consider the party's preparation of the *TMC* Agreement in assessing intent. This contention is contrary to both contract interpretation principles (*Banning Ranch, supra,* 193 Cal.App.4th at p. 915) and

---

[11]    The parties discuss *Thiele v. Merrill Lynch, Pierce, Fenner & Smith* (S.D. Cal. 1999) 59 F.Supp.2d 1067, in connection with the existence of multiple agreements here. *Thiele* deals with a superseded agreement, which is not at issue, and thus is inapposite. (See *Thiele,* at pp. 1070-1072 [company could not enforce arbitration under earlier, superseded contract].)

16

defendants' other arguments (e.g., their attempt to rely on party conduct in *Seyfferth* and *Zamel*).[12]

We conclude the *Davis* Agreement does not require arbitration of *Katz*-related disputes.  If defendants desired the *Davis* Agreement, and its arbitration obligation, to extend to other matters, it "was [their] responsibility to draft a clear and explicit agreement to that effect . . . ."  (*Mayhew*, *supra*, 53 Cal.App.4th at p. 1370.)[13]

2. *Applicability of the Davis Agreement to nonsignatories*

Because defendants cannot compel arbitration of *Katz*–related disputes under the *Davis* Agreement, we need not determine whether the nonsignatories are bound to arbitrate such disputes.  However, we elect to address certain of defendants' arguments in this regard.  The "general rule" is "against compelling nonsignatories to arbitrate," but

[12]    In an argument relating to party conduct, defendants question the relevance of the trial court's finding that nine months passed between the *Davis* Agreement and *Katz*.  We agree the passage of time, without more, would not render an arbitration agreement unenforceable.  (See, e.g., *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1403, 1407 [rejecting plaintiff's effort to avoid arbitration under employment agreement because claims occurred after employment ended, explaining "temporal test misconstrue[d] the applicable standard" and arbitrability did not turn on "when the[] [claims] occurred."]; cf. *Cochran v. Rubens* (1996) 42 Cal.App.4th 481, 488 [physician could not compel arbitration under agreement signed three years prior, where evidence reflected relationship terminated at the time].)

[13]    We note that neither the parties, nor the trial court, focus on the actual arbitration provision in the *Davis* Agreement (paragraph 17), which purports to require Blue Haven and Golden State to arbitrate disputes over G&R's legal services "under this agreement or otherwise . . . ."  On appeal, G&R has failed to make, and thus has forfeited, any argument based on this language.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793 ["'[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived.'"].)

17

there are exceptions. (*Crowley Maritime Corp. v. Boston Old Colony Ins. Co.* (2008) 158 Cal.App.4th 1061, 1065 (*Crowley*).) Defendants do not establish any.

First, defendants suggest the nonsignatories are required to arbitrate as third party beneficiaries of the *Davis* Agreement. This can be a basis for compelling arbitration (*Crowley, supra,* 158 Cal.App.4th at pp. 1069-1070), but the third party beneficiary must be "one of a class of persons for whose benefit [the agreement] was made." (*Steve Schmidt & Co. v. Berry* (1986) 183 Cal.App.3d 1299, 1313.) " '[I]t is not enough that the third party would incidentally have benefited from performance. [Citations.]' [Citation.] 'The contracting parties must have intended to confer a benefit on the third party.' " (*Epitech, Inc. v. Kann* (2012) 204 Cal.App.4th 1365, 1372.) Under the *Davis* Agreement, G&R agreed to provide legal representation to Blue Haven and Golden State. Defendants identify nothing in the *Davis* Agreement or the record to suggest the agreement was intended to benefit the nonsignatories. Even if it were sufficient for the nonsignatories to receive benefits, defendants have not made that showing, either. They suggest the nonsignatories benefited from the *Davis* Agreement by receiving legal representation in *Katz* and other matters. But they have not established *Katz* or the other matters were governed by the *Davis* Agreement, meaning they cannot characterize that legal work as a benefit of the *Davis* Agreement.

The authorities cited by defendants do not support their position. (§ 3521 [providing "he who *takes the benefit* must bear the burden," italics added]; *NORCAL Mutual Insurance Company v. Newton* (2000) 84 Cal.App.4th 64, 67-68, 84 [wife of insured psychiatrist required to arbitrate malpractice dispute covered by insurance policy,

18

under which both psychiatrist and wife received a defense; "fundamental point" was she could not use policy to her advantage, then avoid arbitration under it]; *Macauley v. Norlander* (1992) 12 Cal.App.4th 1, 4, 7-8 (*Macauley*) [introducing broker could enforce arbitration against investors, as beneficiary of agreement between investors and clearing broker, where, among other things, agreement explained dual-broker relationship, was necessary to service investor accounts, and stated arbitration provision applied to introducing broker].)[14]

Second, defendants argue the nonsignatories can be compelled to arbitrate based on their preexisting relationships with G&R. A preexisting relationship can " 'mak[e] it equitable to compel the nonsignator[ies] to . . . be bound to arbitrate' " and "supports the implied authority of the party to bind the nonsignatory." (*Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 600.) Again, however, defendants do not establish these principles apply here.

Defendants contend the *Davis* Agreement's arbitration provision states it applies to "agents" and "related entities" and that the nonsignatories must arbitrate under these provisions. However, defendants do not explain how this language would be sufficient to bind nonsignatories to arbitration, absent any showing that Blue Haven or Golden State had authority to bind them or that it would be equitable to do so. (See, e.g., *Weyand*,

---

[14]    *Macauley* is also distinguishable because it involved a nonsignatory seeking to *compel* arbitration. (See *Benasra v. Marciano* (2001) 92 Cal.App.4th 987, 991 (*Benasra*) ["It is one thing to permit a nonsignatory to relinquish his right to a jury trial, but quite another to compel him to do so.]; *DK Joint Venture 1 v. Weyand* (5th Cir. 2011) 649 F.3d 310, 316 (*Weyand*) [" '[I]t matters whether the party resisting arbitration is a signatory or not.' "].)

*supra*, 649 F.3d at pp. 318-319 [rejecting argument that officers were bound to arbitrate because agreements referred to "affiliates" and officers were affiliates, explaining that "even if the . . . Agreements could be interpreted in that manner," the corporations lacked authority to bind the officers and "[i]n the absence of such authority, the language about 'affiliates' . . . cannot have been sufficient to make the arbitration provisions binding on [them]"].)  Neither the status of Namer and Lazlo as corporate officers, nor Namer's execution of the agreement on behalf of the companies, changes this analysis.  (*Id*. at p. 314 ["[T]hat the . . . corporations entered into the . . . Agreements did not cause their agents, . . . who acted only as officers on behalf of the corporations, to be personally bound by those agreements."]; *Benasra*, *supra*, 92 Cal.App.4th at p. 991 [rejecting argument that individual who signed agreement as president of corporation was bound to arbitrate individual claim].)

Defendants' reliance here on *Westra v. Marcus & Millichap Real Estate Investment Brokerage Co., Inc.* (2005) 129 Cal.App.4th 759 (*Westra*) is misplaced. *Westra* involved a real estate broker's motion to compel arbitration, in an action arising from a transaction in which the broker was the agent for both parties.  (*Id.* at pp. 762-763, 766.)  The broker relied on the arbitration clause in the transaction's purchase agreement, to which it was not a party.  (*Id.* at p. 763.)  The court held the broker could compel arbitration, based on the preexisting relationships and the arbitration provision, which stated, "Buyer, Seller, and Agent agree . . . " to arbitration.  (*Id.* at p. 766.)  Here, in contrast, the *Davis* Agreement did not reflect that the nonsignatories agreed to arbitrate, but, rather, simply identified agents and related entities as parties purportedly required to

arbitrate. Further, unlike the *Westra* broker, who was involved in the underlying transaction, defendants do not establish the nonsignatories had any role in the *Davis* case that would render arbitration equitable. (*Id.* at p. 765.)[15]

In addition, defendants suggest compelling arbitration would be equitable because all respondents were "frequent clients," and reiterate that prior to *Katz*, G&R represented plaintiffs in *Davis*, *Zamel*, and *Seyfferth*, "all under the terms of the Davis LSA." But, again, defendants did not establish the post–*Davis* cases were under the terms of the *Davis* Agreement. In turn, they provide no authority that simply being a frequent client, without more, would make it equitable to require arbitration under a legal services agreement for a previous matter.

Finally, defendants suggest the nonsignatories impliedly consented to arbitration under the *Davis* Agreement, based on their agreement to the *Katz* conflict waiver and "continued representation" by defendants following *Davis*, including in *Katz*. Even if implied consent were a basis for compelling arbitration (and defendants direct us to no authority that it is), defendants provide no evidence of such consent.[16] Rather, they

---

[15]    In addition, *Westra*, like *Macauley*, *supra*, 12 Cal.App.4th at page 4, involved a nonsignatory attempting to compel arbitration. (*Westra, supra,* 129 Cal.App.4th at p. 763.) See footnote 14, *ante*.

[16]    *Bak v. MCL Financial Group, Inc.* (2009) 170 Cal.App.4th 1118, discussed by both parties with respect to the consent issue, is inapposite. (*Id.* at p. 1126 [affirming sanctions order by arbitration panel against attorney who represented parties in arbitration, on grounds he subjected himself to the panel's jurisdiction].)

21

simply reiterate their other arguments for on-going application of the *Davis* Agreement, and we reject them for the same reasons.

We conclude that none of the plaintiffs are required to arbitrate their *Katz*–related disputes with defendants.[17]

### III.  DISPOSITION

The order is affirmed.  Plaintiffs are awarded costs on appeal.


NARES, J.

WE CONCUR:


BENKE, Acting P. J.


O'ROURKE, J.

---

[17]    Defendants suggest the trial court held nonsignatories can never be required to arbitrate.  The court's order does not support this assertion.  In any event, defendants have not established any plaintiffs are required to arbitrate here, so any error in this regard would be harmless.  (See, e.g., *American Federation of State etc. Employees v. County of Los Angeles* (1983) 146 Cal.App.3d 879, 887.)